MAUD J. HAMILTON, Administratrix of Estate of George Fanger, Appellant, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY.—300 S. W. 787.

Division Two, October 10, 1927.

124

*Charles P. Noell* for appellant; *Glen Mohler* of counsel.

*E. T. Miller* and *A. P. Stewart* for respondent.

HENWOOD, C.—This is a suit for damages under the Act of Congress known as the Federal Employers' Liability Act, filed in the Circuit Court of the City of St. Louis by the (plaintiff) appellant, as administratrix of the estate of George Fanger and for the benefit of Fanger's widow and six minor children, based on the alleged negligence of (defendant) respondent as the cause of Fanger's death while employed by it as a railroad brakeman and while engaged in interstate commerce. The trial resulted in a verdict for the plaintiff in the sum of $10,000. Defendant's motion for a new trial was sustained on the specified grounds that the demurrers to the evidence offered at the close of the plaintiff's case in chief and at the close of all of the evidence should have been sustained. Plaintiff's appeal from the order of the trial court sustaining the motion for a new trial brings the case here for review.

In general, the plaintiff's theory of recovery is that Fanger was struck by the waterspout of defendant's water tank near Moselle, Missouri, while engaged with his duties as head brakeman on one of defendant's freight trains and while on the running board of the engine and thereby knocked off of the engine and killed. Though other items of negligence were pleaded concerning the operation and maintenance of the waterspout in question, the plaintiff submitted her case only on the allegation "that the waterspout was defective in that it did not have sufficiently heavy weights attached thereto to keep it in an upright position when not in use by the trainmen in taking water so that it would not stay in position but would lower by its own weight and gravity across the tracks and thereby be not reasonably safe for the employees on defendant's trains." [Appellant's brief, p. 2.]

The defendant's answer to the trial petition was a general denial.

At the beginning of the trial the parties stipulated and agreed that the train in question was carrying interstate shipments of freight, and that at the time Fanger was killed he and the defendant were engaged in the business of interstate commerce.

It appears from the evidence adduced by plaintiff that at the time of his death Fanger .was forty-two years of age and, excepting a temporary absence of two months, had been employed by defendant as a brakeman for a period of five years. He left surviving him his widow and six minor children, all dependent upon him for support.

Defendant's line of railroad with which we are concerned in this case extended in a general southwesterly direction from St. Louis, Missouri, through Pacific, Moselle, Stanton, Newburg and to points beyond, Newburg being a division point for freight trains. On the fatal trip Fanger left St. Louis on July 21, 1923, about eleven P. M. as head brakeman on Extra 43 westbound with engine No. 43 and forty-odd cars in the train. His duties as head brakeman required Fanger to attend to the coupling and uncoupling of the engine, to throw switches and to inspect the front part of the train at stops. In attending to these duties it was customary for the head brakeman to ride on the engine between stops. A seat was provided for the head brakeman on this engine (No. 43), on the left side of the cab in front of the fireman's seat. On this seat the head brakeman interfered to some extent with the work of the fireman, and in warm weather this seat was uncomfortable on account of being close to the boiler and fire-box. For these reasons the head brakeman sometimes rode on the pilot of the engine in the summer season. This train made its first stop at Pacific, thirty-four miles west of St. Louis, where the engine was uncoupled to take on a new supply of coal and water. At Pacific, Fanger was seen by other members of the train crew attending to his duties and apparently in robust health and normal in every way. Upon leaving Pacific this train was not scheduled to stop again until it reached Stanton, twenty-eight miles west of Pacific and sixteen miles west of Moselle, Stanton being designated in the dispatcher's orders as a meeting point with the third section of train No. 34 eastbound. About a mile east of its station at Moselle and on the south side of its tracks defendant maintained a water tank, with a waterspout attached, which was used, when necessary, in supplying its engines with water. Several hundred feet west of the water tank defendant's tracks crossed the Meramec River on a bridge, consisting of two spans of overhead structure in the middle and approaches at each end thereof, known as deck plate girders. There was a long curve in defendant's tracks as they approached this water tank from the east, but the tracks were practically straight from the water tank to the station at Moselle, and there was a heavy upgrade extending about six miles to the westward from Moselle, known as Iron Hill. Not being scheduled to stop at Moselle, Extra 43 was taking a run for Iron Hill as it passed the water tank and was running at the rate of about thirty miles per hour. After the train pulled out of Pacific, Fanger was

not seen by any member of the crew until they were on the curve east of the water tank, when the fireman saw the figure of a man with a lighted lantern coming from the pilot of the engine onto the running board and toward the cab on the left or fireman's side of the engine. It is a compelling inference that the man on the running board was Fanger, and both sides so agree. About the time the fireman saw the man with the lantern on the running board and before the engine reached the water tank the fireman left his seat in the cab and stepped down to the deck of the cab, as he states was his custom when his engine was approaching water tanks and overhead bridges. In this connection he further states that he was getting his fire ready for the long pull over Iron Hill. After the train entered the bridge there was a crash at the cab windows on the fireman's side and the glass of the windows was thrown into the deck of the cab and across to the engineer's seat on the opposite side of the cab. The storm-window or windshield on the fireman's side was torn off in this crash. It was about two feet long and six inches wide, and was attached to the outside of the cab in a perpendicular position. The fireman told the engineer to stop; that he thought the brakeman had been struck and knocked off of the running board. This happened about two A. M. July 22, 1923. The train was stopped on the west side of the bridge and Fanger's dead body was found in a sitting posture, facing south, on the truss rods or stringers near the west end of the overhead structure and on the south side and below the level of the tracks, 631 feet west of the water tank. "In the back of his head was a big hole." The next day marks and scratches were found on one of the uprights or ladder posts of the bridge on the south side and near the east end. A few feet beyond or west of these marks and scratches blood spots were found on the truss rods or stringers of the bridge, 527 feet west of the water tank. One of plaintiff's witnesses (Ledbetter), who was employed at the plant of the St. Louis Material & Supply Company near the bridge, testified on this subject, as follows:

"I looked at this bridge and saw some marks on the bridge. It looked like marks where something had been scraped down on the side of the bridge. They were about eight feet above the top of the rail above the face of the bridge from the end of the ties. There were marks and scratches on the paint as if it had been rubbed hard. It looked like someone had drug down there and fell, like a shoe heel, filled with tacks or something like that. This was on one of those uprights or a ladder post about two feet ahead of the place where I saw the blood stains. The post would be about three or three and a half feet from the clearance of a train on the track. From the outside of the cab to this iron I was talking about would be about two feet and a half. I knew George Fanger and would judge that from

the front of his chest to the back of his shoulders would be about fourteen or fifteen inches. This ladder post is a wider metal beam than the others.''

After the accident was reported, Extra 43 was held at Moselle until the arrival of the eastbound train (third section of No. 34). The crew of the eastbound train assisted in removing Fanger's body from the bridge, and it then continued its trip eastward, crossing the bridge and passing the water tank. Extra 43's engine then backed up its entire train and took water at the water tank before starting west. The waterspout was found in its normal position.

Plaintiff placed the fireman (Duncan) on the witness stand and the following is gathered from his testimony:

''My attention was attracted *under* the bridge.'' (Italic ours.)

''I do not recall passing the water tank that night and heard no crash or noise. *When we got on the bridge* I heard a crash of glass. The cab windows were broke in and the little deflector or storm-window was torn off. It throwed glass inside the cab and you could not help noticing it. It was these forward windows here on defendant's Exhibit No. 3, the little deflector back of that. The front window of the cab was not broken. It was the forward side window on the fireman's side. There were probably two or three of the panes broken, there are four altogether in the cab, I do not think they were all broken, and the deflector was torn off.'' (Italics ours.)

''There are two side windows on each side of the cab; they have sliding sashes in them with panes of glass and can be slid one way or the other. There is also a window in the front of the cab between the side and the boiler on each side, which can be swung back for the purpose of ventilation. It is not large enough for a man to get through there on account of the size of the boiler.

''On locomotive 43 the running board comes out so that the edge of the running board is flush with the side of the cab. The small ledge or projection at the bottom of the cab on which the man shown in the picture is standing is probably four inches in width.

''After the accident we backed up and took water from that tank. We came back east the next day from Newburg. I did not examine the spout that night and paid no particular attention to it and did not examine the weights. I do not know whether it was off to aside, low or standing erect. I reached up and pulled it down by a little ring attached to the goose-neck spout. I think there was a short piece of bale cord hanging to it. I did not examine the spout to see whether there were any signs on it as though Mr. Fanger was struck by it. It was in the same position that I have always found it, up out of the way; I had to reach up and pull it down in order to get to the tank to take water. I got the spout to go up by lifting it up. You shove it up with your hand. It is not hard to get up. I gen-

erally hold it in my hand and keep my hand against it. I have never had occasion to use a rod in getting it up and I never paid any attention to the weights on it.''

It further appears from the plaintiff's evidence that the near side of the water tank was ten feet from the south rail of the tracks, and that the water spout normally rested in an upright position somewhat closer to the tracks. When in use for supplying water to an engine it was pulled down crosswise with the tracks and carried the water from the goose neck at the base of the spout to the opening in the water tank of the engine, located at the middle of the tender. This spout was made of galvanized iron and its weight was estimated at 115 to 120 pounds. According to measurements taken in April, 1924, the spout was 18.7 feet above the rail at the top, 13.6 feet at the base, and approximately fifteen feet at the middle. It was lowered, and raised again, by means of chains attached to the spout and extending upward through pulleys on the side of the tank and then extending downward to or near the base of the tank where weights were attached to the ends of the chains on each side of the spout. Former employees of the defendant and other witnesses for the plaintiff testified that for a long time prior to the accident two angle irons, bolted together, were attached to the end of each chain to serve the purpose of the regular counterweights ordinarily used on water tanks. These angle irons were about twenty-two to twenty-four inches in length and weighed about ten or twelve pounds apiece, being ordinarily used to connect the rails of the track. Some of these witnesses said the spout did not raise and lower properly during the summer of 1923, because of the chains being more or less out of order; others said they observed the spout hanging lower than its normal position and angling to the west instead of straight out from the tank, a few days before the accident. It was also said that passing trains would sometimes cause the spout to shake or vibrate, but such shaking or vibration did not lower its position. One of these witnesses (Ledbetter), who is quoted above as to the marks and blood stains on the bridge, said that during the week before the accident he saw the spout hanging low, between fifteen and sixteen feet above the top of rail, and that just exactly one week prior to the accident he saw the fast eastbound passenger train stop at the water tank, without taking water, and saw the fireman go out on the running board of the engine and push the spout up to its proper place with an iron clinker bar after he had pushed it up once with his hands and it had fallen down again. He admitted that the smokestack of the engine had passed the spout before the fireman went out on the running board and pushed it up. He also admitted that he had seen trains pass the spout when it was lower than normal and never saw the spout strike anything; that furniture cars were

much higher than ordinary box cars and that he saw furniture cars clear the spout on occasions when it was in the low position he described. This same witness (Ledbetter) further said that the next day after the accident he found some broken glass along the south side of the tracks, out from the ties, about forty feet west of the water tank. In this connection he said:

"Well, it was all sizes, pieces from that big, some a little larger and kind of, to the best of my knowledge, it looked like *table glass.*" (Italics ours.)

"*That is all I found;* it looked to me like fresh broken glass." (Italics ours.)

"Q. You don't know how long this glass had been there? A. Could not say."

Another one of the witnesses (Caviness), an ex-fireman, testified that he handled this spout in taking water for his engine about noon on July 21, 1923, and found it in its normal position, and lowered and raised it with his hands, and it worked without difficulty in the usual and normal way.

One of these witnesses (Bourbon), night watchman at the plant of the St. Louis Material & Supply Company, testified that, after going home for his midnight lunch, he passed by the water tank between 1:15 and 1:30 A. M. on July 22, 1923, and observed the spout hanging lower than normal. Among other things, he said:

"Q. How close was this spout to this track, if you know? A. *Well, I am not certain, I do not know that.*" (Italics ours.)

"Q. You do not know that, in feet? A. *No, sir, I do not.*" (Italics ours.)

"Q. Just point to it, point to it. A. Well, the spout was hanging in a lower position.

"Q. Than this picture? A. Yes, sir, it was, it was hanging considerably lower and *also it was swung to the west.*" (Italics ours.)

"Q. You have drawn a line on Plaintiff's Exhibit D, and I will stick a pin through it. A. Now, understand that line represents the *lower side of the spout.* From my own observation I would say that the spout as it stood that night when I passed there would be *about eighteen feet from the rail of the track.* I do not know how high the tank is from the ground." (Italics ours.)

On cross-examination, he repeated twice his *estimate of eighteen feet.* On the following day he was recalled to the witness stand by the plaintiff and testified as follows:

"I wish to change my testimony from yesterday as to the height of this waterspout. I am satisfied I was mistaken because I stated *when I said it was eighteen feet that I did not know.* Since then I have looked at the pictures and thought about my knowledge of it

from being out there and *was mistaken when I said it was about* *eighteen feet high.* *After studying the matter over* and looking at this picture *I would judge it to be fourteen feet on the morning of* *July 22nd at* 1:30 A. M." (Italics ours.)

On cross-examination, he admitted that since giving his testimony on the previous day he had talked to the witnesses Ledbetter, Tyler, Moore and Caviness, and the plaintiff's attorney, Mr. Noell, but denied that he talked to Mr. Noell about changing his testimony. And also said he had not been around the waterspout since testifying the day before.

Plaintiff's evidence further shows that Fanger was about six feet tall and weighed about 180 pounds; that the running board on engine No. 43 is nine feet and three inches above the top of the rail; that the top of the cab is about five feet higher than the running board; that the top of the boiler is higher than the top of the cab; and that the top of the smokestack, whistle and steam-dome are considerably more than six feet higher than the running board. Also, that engine No. 43 overhangs the rail two or three feet on each side.

Photographs showing the tracks, the water tank and spout, and the bridge (Exs. A, B, C, D, I and J), and plats showing the relative location of the same and certain measurements (Exs. E and F) were referred to by some of plaintiff's witnesses and received in evidence in connection with their testimony.

The defendant's evidence includes the testimony of the engineer on engine No. 43 and other members of the crews in charge of Extra 43 and 3rd No. 34, relating to the accident and surrounding circumstances; also, photographs of engine No. 43, the bridge, and the water tank and spout (Exs. 1 to 8 incl.), and testimony as to their construction and use, and actual measurements as to distances and as to the relative position of certain parts of the engine, the bridge, and the water tank and spout. But, we find nothing in the defendant's evidence which is directly or inferentially helpful to the plaintiff's theory of recovery.

The serious question presented by this appeal is whether the evidence, as a whole, that is, all facts proven, and all reasonable and legitimate inferences to be drawn therefrom, made a case for the jury. After a very careful consideration of the evidence in its most favorable aspect to the plaintiff, it is our conclusion that it fails to meet the test prescribed by well-established rules of law.

It must be conceded that, in order to uphold the verdict in this case, the evidence must show, first, that defendant was negligent in maintaining the waterspout in question without sufficient counterweights to prevent it from lowering of its own weight and gravity; second, that, by reason of such insufficient weights, the waterspout

was hanging low enough to strike Fanger when he passed it on the running board of the engine; and, third, that Fanger was struck by the waterspout and thereby knocked off the engine and killed. As we read the briefs of learned counsel for both sides, this much is conceded.

We think there was substantial evidence tending to show that the waterspout did hang low enough, at times shortly before the accident, to be in a position of danger to employees of defendant on its passing trains, although it does not clearly appear from the record that the dangerous position of the waterspout on such occasions was caused by insufficient weights; nor does it appear what the size, in pounds, or shape, of such weights should be to make the waterspout function properly and with reasonable safety. As to the position of the waterspout immediately before Extra 43 passed it, we have only the observation and estimate of the one witness (Bourbon), who says he passed the water tank between 1:15 and 1:30 A. M., or between thirty and forty-five minutes prior to the accident. As shown by the testimony of this witness, above quoted, when first asked how close the waterspout was to the track he said: "Well, I am not certain, I do not know that." When asked for the distance in feet, he said he did not know. Later, he estimated the distance at *"eighteen feet"* and repeated this estimate twice on cross-examination. He also said the waterspout *"was swung to the west."* Overnight, this witness discovered a mistake of *four feet* in his estimate of *"eighteen feet"* and, "after studying the matter over" and after talking it over with other witnesses for the plaintiff and plaintiff's trial attorney, Mr. Noell, he took the stand again and placed the distance between waterspout and track at *"fourteen feet."* Plaintiff's counsel insist that this evidence tended to show that the waterspout was hanging *low enough* to have struck Fanger as he passed it, standing on the running board of the engine, and, without challenging its integrity or probative force, we think it did tend to show as much. But, to infer from this that the waterspout *did in fact strike Fanger* takes us into the realm of speculation and conjecture. In this connection, it should be noted that this witness said that the waterspout in this low position "was swung to the west." Also, that other witnesses for the plaintiff testified that it angled to the west, when hanging lower than its normal position. If it "swung to the west" far enough, it was not in the path of passing trains. If it was crosswise or horizontal with the tracks, it would have struck the smokestack and whistle and steam-dome of the engine or some one of them, as all of them were higher than Fanger's head as he stood on the running board of the engine. It must be remembered, also, that the fireman (Duncan), in testifying for the plaintiff, said: "My attention was attracted *under* the bridge." (Italics ours.)

"I do not recall passing the water tank that night and heard no crash or noise. *When we got on the bridge* I heard a crash of glass." (Italics ours.) And it must be remembered that he further said: "After the accident we backed up and took water from that tank." "I did not examine the spout to see whether there were any signs on it as though Mr. Fanger was struck by it. *It was in the same position that I have always found it, up out of the way,* I had to reach up and pull it down in order to get to the tank to take water." Italics ours.) Counsel also insist that the broken glass found along the south side of the tracks, forty feet west of the water tank, tended to show that Fanger's lantern globe was broken when he was hit by the waterspout. The finder of the broken glass (Ledbetter) said it looked like "table glass." Again, we must invade the realm of speculation and conjecture to infer that the *"table glass"* was *lantern globe glass;* especially, when it does not appear whether Fanger's lantern fell into the Meramec River, intact or in pieces, or where it landed, or its condition. To sustain the finding of the jury that Fanger was struck by the waterspout, because the waterspout was hanging low enough to have struck him and because some broken glass was found forty feet west of the water tank in the face of the other physical facts surrounding the accident, would offend against the rule that verdicts must be based upon substantial evidence and not upon speculation and conjecture. And, if such finding could be reached only by speculation and conjecture, to uphold it would also violate the rule that a causal connection must be established between the negligence charged and the accident; in other words, there must be a direct connection between the negligent act and the injury, and the negligence must be the proximate cause of the injury.

This suit being brought under the provisions of the Federal Employers' Liability Act, the rulings of the Federal courts are controlling. However, the rules above mentioned have been followed so long as to become elementary in this and other States.

In the case of C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 478, the Supreme Court of the United States said:

"The employer is liable for injury or death resulting in whole or in part from the negligence specified in the Act; and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to the control of the several States. This court will examine the record, and if it is found that as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be reversed. [Citing cases.] . . .

"It is the duty of the trial judge to direct a verdict for one of the parties when the testimony and all the inferences which the jury reasonably may draw therefrom would be insufficient to support a

134

different finding. [Baltimore & Ohio R. R. Co. v. Groeger, 266 U. S. 524.] When the evidence and the conclusions which a jury might fairly draw from the evidence are taken most strongly against the petitioner, the contention of respondent that the bent pipe caused or contributed to cause the death is without any substantial support. The record leaves the matter in the realm of speculation and conjecture. That is not enough. [Citing cases.]"

The same court, in St. L.-S. F. Ry. Co. v. Mills, 271 U. S. 347, held: "The evidence must at least point to the essential fact which the jury is required to find in order to sustain the verdict."

Both of these cases are cited with approval in the more recent case of Northern Ry. Co. v. Page, 47 Sup. Ct. Rep. 493, in which the same rules are stated in somewhat different fashion, as follows:

"The burden was on plaintiff to show that defendant's negligence, as specified above, was the proximate cause of his injuries. Under familiar rules, plaintiff was entitled to prevail if the evidence and the inferences that a jury might legitimately draw from it were fairly and reasonably sufficient to warrant a finding in his favor. Otherwise the judgment must be for defendant. [C. M. & St. P. Ry. v. Coogan, 271 U. S. 478, and cases cited.] The verdict cannot be sustained if essential facts are left in the realm of conjecture and speculation. [St. Louis Ry. v. Mills, 271 U. S. 347.]"

In dealing with similar situations, this court has uniformly held to the same effect. [Warner v. Ry. Co. 178 Mo. 133, 134; State ex rel. v. Bland, 313 Mo. 254.]

The cases cited and relied on by plaintiff, both Federal and State, are readily distinguishable from this case on the facts, and, therefore, have no application here.

In our opinion, the bridge is the tell-tale of this accident. The shoe-nail prints and rubbed place on the paint of the ladder post and the blood spots on the truss rods or stringers of the bridge and the narrow space between the cab windows of the engine and the side of the bridge, together with other physical facts, tend to establish with reasonable certainty that Fanger was struck by the bridge and not the waterspout. Plaintiff's contention that the evidence is sufficient to justify the jury in finding "that he was struck by the spout and injured or at least dazed and that he was knocked off or fell off the engine at the bridge about the time the cab windows were broken" involves the wildest sort of speculation. Juries are not permitted to exercise their imagination in reaching verdicts. And this calls to our attention the application of another familiar rule, which is decisive of this question. It is very clearly stated by this court in the case of Warner v. Ry. Co., 178 Mo. 134, as follows:

"If the injury may have resulted from one of two causes, for one of which and not the other, the defendant is liable, the plaintiff must

show with reasonable certainty that the cause for which the defendant is liable produced the result, and if the evidence leaves it to conjecture, the plaintiff must fail in his action. [Smart v. Kansas City, 91 Mo. App. 586; Epperson v. Telegraph Co., 155 Mo. 346; Smith v. Bank, 99 Mass. 605; Searles v. Railroad, 101 N. Y. 661; Peirce v. Kile, 26 C. C. A. 201.]''

This rule is followed by the Federal courts in all negligence cases and is quite uniform in other jurisdictions.

The defendant complains of the action of the trial court in giving plaintiff's main instruction (No. 2) and in refusing certain withdrawal instructions offered by defendant, as additional grounds, upon which its motion for a new trial should have been sustained. We find no merit in these complaints.

In accordance with our conclusion that the plaintiff failed to make a case for the jury on the negligence charged, the order of the trial court, in sustaining defendant's motion for a new trial on the grounds that the demurrers to the evidence should have been sustained, should be affirmed, and the cause remanded. It is so ordered. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.