WILLIAM VINCENT BYARS v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, and FEHLIG-FERRENBACH, INC., Appellants.—66 S. W. (2d) 894.

Division Two, December 20, 1933.

*T. E. Francis, B. G. Carpenter* and *Allen, Moser & Marsalek* for St. Louis Public Service Company.

*Jones, Hocker, Sullivan & Gladney* for Fehlig-Ferrenbach, Inc.

*Glendy B. Arnold* and *William H. Biggs* for respondent.

FITZSIMMONS, C.—Plaintiff in the St. Louis County Circuit Court obtained judgment in the sum of $10,000 damages for personal injuries, against both defendants, St. Louis Public Service Company and Fehlig-Ferrenbach, Inc. From this judgment both defendants took separate appeals which we will consider together.

Appellant, St. Louis Public Service Company at the time of respondent's injury, October 24, 1929, operated an electric street railway system. Part of this system was a westbound single track on Washington Avenue, in Kirkwood, St. Louis County, over which track ran cars of the Kirkwood-Ferguson and Manchester lines. Appellant, Fehlig-Ferrenbach, Inc., was a construction company, and, at the time mentioned, was engaged in the work of laying a concrete surface on the south side of Washington Avenue, between Fillmore Street at the east and Kirkwood Road at the west. Taylor Avenue, a north and south street, intersected Washington Avenue midway between Fillmore Street and Kirkwood Road. Appellant, Fehlig-Ferrenbach, Inc., put up guards, or barricades at the intersection in order to keep vehicles from entering upon or traveling over the freshly laid concrete on Washington Avenue, and also from passing along Taylor Avenue over the intersection. The most westerly of these barricades was immediately east of the west cross-walk of Taylor Avenue at its intersection with Washington Avenue. This barricade consisted of a metal drum or barrel, standing upright near the car track, and of a plank, one end of which lay upon the top or the rim of the barrel and the other end rested in the street near the curb of the intersecting streets. The west cross-walk of Taylor Avenue at the Washington Avenue intersection was open to persons on foot going north or south, and the westbound track on Washington Avenue was being used by the street cars of the service company. Respondent, in his amended petition, describing the circumstances of his injury, states that, on the day in question, "he walked south across said Washington Avenue, on the west side of Taylor Avenue, on that part of said Washington Avenue commonly used by pedestrians in crossing said street, at said place, and within close proximity to said barricade, and when he had reached a point, at or near the south curb of said Washington Avenue, about ten or twelve feet south of said street car track, a street car of said Public Service Company, in charge of its agents and servants, was run into and against the ends of the aforesaid planks forming said barricade, as aforesaid, with such force and violence as to cause said planks to be thrown against and to strike the body and legs of plaintiff, with great force and violence, then and there inflicting upon plaintiff the injuries hereinafter set forth."

Respondent charges that his injuries were caused by the "joint and concurring carelessness and negligence" of appellants in the following particulars: "That the agents and servants of defendant,

Public Service Company, in charge of said street car, either saw, or by the exercise of ordinary care could have seen said barricade placed across said street, as aforesaid, and the danger of collision therewith and injury to plaintiff in time to have avoided said collision, and injury to plaintiff, by the exercise of ordinary care, in the operation of said street car while approaching and passing said barricade, but negligently and carelessly failed and neglected to exercise such care, and by reason thereof caused said street car to run into and collide with said barricade, and to injure plaintiff, as aforesaid. That defendant, Fehlig-Ferrenbach, Inc., negligently and carelessly placed the planks, constituting the aforesaid barricade, so close to said street car track as to cause said collision of said street car with said barricade and the injury of plaintiff as aforesaid.''

Each appellant forcibly urges that its separate demurrer to the evidence should have been sustained. Mr. Byars, the respondent, very soon after eight o'clock on the morning of October 24, 1929, left his Kirkwood home on the west side of Taylor Avenue and north of Washington Avenue and walked southwardly to and nearly across Washington Avenue. When he reached Washington Avenue he looked east and saw a service company electric car of the Kirkwood-Ferguson line turn west into that avenue at Fillmore Street, a block east of Taylor. He crossed the street, passed over the car track and was about to step upon the curb to the sidewalk on the south side of Washington Avenue, when he was struck with a heavy plank from behind, upon the right leg between the ankle and the knee. He was thrown backward into a sitting position upon the plank, with his right leg beneath the plank. The street car, which he had observed turn westwardly into Washington Avenue at Fillmore, was immediately behind him and passing over the west cross-walk at Taylor Avenue, when he first felt the impact of the plank. This plank had been part of the barricade next to which he was walking when struck. He was carried to his home and thence he was moved to a hospital.

The street car which was passing when Mr. Byars was struck continued westward, turned at a loop, and, over another Kirkwood street, went its way toward Ferguson, its other terminal. Kirkwood police learned from other street car men the scheduled time for the return of that car. At the appointed time of return, they examined a Kirkwood-Ferguson car at the loop and found that twelve inches of moulding on the left side of the vestibule had been freshly broken off. The moulding was estimated to be about four feet above the surface of the street. Other witnesses testified that the end of the plank which rested upon the upright barrel and projected toward the car track was about four feet high. The moulding was painted yellow with a red stripe. Mr. Werthmueller, superintendent of ap-

pellant Fehlig-Ferrenbach, Inc., testified that he examined the plank, immediately after Mr. Byars had been injured, and he observed on the edge of it some paint which was "yellow with red."

The steel barrel and the plank, which together formed the street barricade close to which Mr. Byars was walking southwardly when hit, were, in their normal fixed position, in alignment with and, as it were, an extension of the west curb of Taylor Avenue. And this barricade was east of Mr. Byars. But after the accident, the barrel lay about fifteen feet (one witness said twenty feet) west of the west cross-walk of Taylor Avenue. And what had been the north end of the plank in its normal position was about ten feet west of where it formerly had been. This was the testimony of a policeman. Mr. Werthmueller, superintendent of appellant Fehlig-Ferrenbach, Inc., testified that the north end of the plank had been thrown to the west about twelve feet beyond its first position, and the barrel or drum was "a little past the plank." Mr. Werthmueller also testified that the steel barrel or drum weighed about twenty-five or thirty pounds and was about twenty-four inches in diameter. The plank was eleven inches wide, three inches thick and twelve feet long and was what Mr. Werthmueller called heavy oak. It is clear that the barrel and the plank had moved in the same direction in which the passing street car was going, namely west, and that, in their passage, the barrel and plank went behind Mr. Byars, the plank in its passage hitting him on the back part of the lower right leg.

Testimony touching on the speed of the car at or about the place and time in question was as follows: Mr. Byars, the respondent, testified that, as he was passing over the track in the middle of Washington Avenue, he looked eastwardly toward the approaching street car. It was then half a block away and "coming very rapidly." The car had come to a position opposite and behind him before he had reached the south curb, which was about twelve or fifteen feet from the track. The car made a noise as it passed by, but he did not look at it. He next saw the car after he had been struck by the board and knocked down. It was then half a block west of him and going at high speed.

Superintendent Werthmueller, upon direct examination as a witness for respondent Byars, testified that on the morning of the accident, he was on Washington Avenue, near Fillmore Street, 200 or 300 feet east of Taylor Avenue, watching his men concreting the street when he saw men running toward the Taylor Avenue intersection. He went to the spot, found Mr. Byars down, with the plank upon his leg and had some of his men take Mr. Byars home. As Mr. Werthmueller was driving to the scene of the accident he saw a street car on Washington Avenue, west of Kirkwood Road, traveling very fast. He tried to overtake it (by inference in an auto-

mobile) but could not. On cross-examination by counsel for his employer, Fehlig-Ferrenbach, Inc., Mr. Werthmueller further testified about the speed of the car: "Q. Now upon what idea or theory do you say that it was moving very fast? A. Well, after I started down there after the car, after the accident rather, the car was out of sight, before I got anywhere near it, and this car was almost down to Clay Avenue, ready to make the turn by the time that I got to Mr. Byars.

"Q. Was there any rocking, swaying motion? A. Yes, sir."

Of the nearness of the barricade to the cars and to the car track there was some diversity of testimony. Policeman Lewis, a witness for respondent, testified that he saw the barricade in place the day before the accident and observed cars pass it safely. He also testified that, after the accident, he saw upon the street surface at a point where the steel barrel had stood a rusty ring. The shortest distance from the near rail of the track to the rusty ring was thirty-one inches by measurement. Policeman Lewis estimated the overhang of the street cars beyond the rails at eighteen inches to two feet. Superintendent Werthmueller, called by respondent, testified that the barricade was put up under his direction the afternoon of the day before the accident and that cars passed safely at intervals of ten and twenty minutes up to midnight that day and beginning about six o'clock on the morning of the accident. At one time he stated that he had allowed a clearance of four inches between the end of the plank and a passing car. At another time he said the clearance was four to six inches. These distances were estimates and not measurements. Upon this point, he testified on redirect examination by respondent: "Q. So I understand when you placed these boards you allowed from four to six inches of clearance? A. Yes, sir.

"Q. For the cars? A. Yes, sir.

"Q. Why did you allow so little clearance? A. Well, because that gave it plenty of room for the distance between the cars and the width of the cars and the drum.

"Q. Why didn't you allow more clearance? A. Because I could not very well on account of the traffic running along the edge of that pavement.

"Q. How is that? A. On account of the traffic running along the edge of that pavement, if they ran off the Public Service Company right of way.

"Q. Well, there was no traffic, there was no traffic in Washington Avenue either east or west of Taylor Avenue? A. Well, there were people living in that block there, yes, sir, they could get in or out on the north side.

"Q. They used the north side of the street? A. Yes, sir.

"Q. Couldn't you have allowed more than four inches and still have kept them off the concrete? A. Four inches from the edge of the pavement?

"Q. Four inches of clearance for the cars to go by? (no answer).

"Q. You say that you placed this plank there about four inches as I understand you? A. Yes, sir, four or five inches over the clearance or body of the car.

"Q. That is when the car was moving along evenly on the track? A. Yes, sir.

"Q. But if they came along at a good rate of speed, that would not allow for the swaying motion of the car? A. No, sir, not quite; yes, sir, that would allow for the swaying motion, five inches, sure it would.

"Q. Well, the car would sway more than five inches going at a good speed? A. I don't know anything about that.

"Q. Well, it would make it very dangerous if the car was going at a regular speed by that plank with a swaying motion? A. Yes, sir.

"Q. Then four inches was pretty close to place that board, was it not? A. No, sir, not necessarily, I am speaking of four inches clearance over the body of the car.

"Q. That is what I am talking about too, in other words if the car had to stop there right by the side of that board there would be four inches clearance? A. Yes, sir, thereabouts.''

Werthmueller also testified that a motorman, approaching along Washington Avenue, toward the barricades at Taylor Avenue, would have no difficulty in seeing them from Fillmore Street, a block away; that the day was clear and Washington Avenue very level.

Jerry Perkins, testifying for his employer, Fehlig-Ferrenbach, Inc., testified that he put up the barricade the day before the accident. He waited for a street car to pass and saw that it cleared. He estimated the clearance at six or seven inches but he did not measure it. Both Perkins' and Werthmueller testified that they looked at the barricade on their way to work at seven o'clock on the morning of the accident, and that it was in the same position as it was the day before.

Patrick Kelly, motorman, operating a Kirkwood-Ferguson car on the day of the accident, passed along Washington Avenue in Kirkwood about five-thirty A. M. on his first trip, and between eight and eight-thirty A. M. on his second trip. He did not strike any obstruction that he knew of on the second trip, and he had no information on the subject until, upon his third trip, a policeman met him at the Kirkwood loop and said that he, Kelly, had had an accident. The policeman called Kelly's attention to the broken moulding. On his trips that day he did not observe anything wrong about the

barricades. He did not testify concerning the speed of his car along Washington Avenue on the day in question.

I. Appellant service company contends that there was no evidence that the motorman saw or by the exercise of ordinary care, could have seen that the barricade was close enough to the car track to be struck by or to come in contact with a passing .car in time to stop the car and thereby to have avoided a collision. This contention unduly limits the issues raised by respondent's amended petition and proof. The negligence pleaded was that the motorman either saw or by the exercise of ordinary care could have seen the barricade placed across the street and the danger of collision in time *not* alone to have stopped the car, as appellant puts it, but in time to have avoided the collision ''by the exercise of ordinary care'' in the *operation* of said street car while *approaching* and *passing* said barricade. There is a major distinction between stopping a car in order to avoid a collision with an object in front of it and the operation of a car so as to avoid a collision with an object near to the track.

In the latter case pleaded care in operation while approaching and passing includes readiness to stop either upon approach or in passage and also a movement prudently slow, until the peril no longer exists. ''On authority of the Bergfeld case an allegation that the servants of defendant negligently operated the street car so as to cause it to collide with the truck ordinarily would permit evidence of any particular negligent operation of the car.'' [Miller v. Kansas City Railways Co. (Mo.), 233 S. W. 1066, citing Bergfeld v. Kansas City Railways Co., 285 Mo. 654, 227 S. W. 1. c. 108, 109.] In these cited cases negligence was pleaded generally as here. We are of opinion that there was substantial evidence in support of respondent's theory of negligent operation of the car in approaching and passing the barricade. The gist of that evidence was the speed of the car, its rocking and swaying motion, and the danger of collision arising out of the concomitant conditions of such speed and motion and of the nearness of the barricade to the track. It is a matter of common knowledge that in city streets with two car tracks in the middle, two walks on the sides, and between tracks and sidewalks, two lanes for vehicles, cars pass a standing truck or other large stationary object so near to the track that a lateral collision is avoided only by the movement of the car at a snail's pace.

As we view the law and the evidence, it is of no moment that cars passed the barricade safely at frequent intervals from four o'clock the preceding afternoon or that the position in which the barricade had been placed had not been changed. We disregard this evidence for the reason that the record does not show that

these other cars and, on its earlier trip, even the car which caused this accident passed the barrier at high speed and with a rocking swaying motion. In view of the distinction which this case presents we do not find to be in point cited cases arising out of injuries or death suffered by persons upon tracks or in colliding automobiles. Of these are Lackey v. United Railways Co., 288 Mo. 120, 231 S. W. 956; Ziegelmeier v. Railway Co., 330 Mo. 1013, 51 S. W. (2d) 1027; Miller v. Wilson (Mo. App.), 288 S. W. 997; Beal v. Railway Co. (Mo.), 256 S. W. 733.

Appellant, St. Louis Public Service Company, further urges in support of its demurrer that the jury could not have returned its verdict on the theory that the motorman ought to have seen and avoided the danger without piling inference upon inference nor without utilizing inferences unwarranted by the evidence and that spin out into pure conjecture. In support of this contention Layton v. Chinberg (Mo.), 282 S. W. 434; State ex rel. Public Utilities Co. v. Cox, 298 Mo. 427, 250 S. W. 551; Hamilton v. Railroad Co., 318 Mo. 123, 300 S. W. 787, are quoted and like cases are cited. There was direct evidence that, as the car approached Taylor Avenue, the barrier was in place and Mr. Byars was walking beside it; that as the car passed the barrier the steel barrel and heavy oak plank were hurled a substantial distance westward in the direction in which the car was going, and Mr. Byars was struck by the plank and injured; that the car was "coming very rapidly," when Mr. Byars observed it half a block east of Taylor Avenue, and that it was "going at high speed," when Mr. Byars, stricken by the plank, again looked at the car, then half a block west of Taylor Avenue; that the street car, later identified by its time schedule was found to have had a piece of moulding freshly broken off; that one end of the barrier plank, after the accident, was marked with yellow and red paint, the color of the car moulding; that the end of the plank was within four inches of the body of a car standing in front of it. In view of these facts, appellant service company quite rightly concedes in its brief: "There is no doubt that this evidence warranted a finding that the car came in contact with the end of the plank." This conceded fact is the only inference drawn and it is far outside the field of conjecture. And under the facts last epitomized and all other facts previously summarized and proved by direct evidence and the conceded inference, negligence was a question of fact for the jury.

Appellant service company also contends that the evidence supports the inference that the plank slipped along the curved rim of the barrel eastwardly, forwardly and downwardly as the car was passing and that in falling the plank struck the side of the car where the moulding was torn off. "The evidence made it highly probable that the accident happened in this manner from a cause

for which this appellant (service company) was not responsible."
In this view of the evidence, the service company argues that its
demurrer should have been sustained upon the principle that a
plaintiff's case must fail, "where the evidence shows the injury
might have been caused by the negligent act, but, in its aspect most
favorable to plaintiff, is just as consistent with the inference that
the injury might have been produced by another cause," not im-
puting negligence. [Kane v. Railroad, 251 Mo. 13, 157 S. W. 644,
quoting Byerly v. Consolidated Light, Power & Ice Co., 130 Mo.
App. 593, 109 S. W. 1065.] This rule does not apply here for the
reason that, as we read the record, there is no evidence from which
we may infer that the plank slipped sideways along the barrel rim
and fell upon the car moulding. At the least the evidence is not
as consistent with the theory that the accident might have been
caused in the nonliability manner suggested by appellant as in the
mode which, we have found, properly may be inferred. This is a
sufficient answer to the point raised. But we may venture, for a
further comment, into natural laws, with the reservations, however,
that, in that field, we are not to be taken as dogmatic, or as speak-
ing with complete authority. It must be conceded that as the street
car approached and was about to pass, the twenty-five pound steel
barrel and the heavy oak plank were in the natural state of inertia
which Webster's New International Dictionary defines to be that
property of matter by which it tends when at rest to remain so,
and when in motion to continue in motion and in the straight line
or direction unless acted upon by some external force. Stated in
other words: "Inertia is a purely negative though universal prop-
erty of matter. It is the property that matter cannot of itself
change its own state of motion or of rest. If a body is at rest it
remains so until some force acts upon it; if it is in motion this
motion can only be changed by the application of some force. This
property of inertia is what is expressed by Newton's first law of
motion." [Ganot's Physics (12 Ed.) translated and edited by E.
Atkinson, Professor of Experimental Science, Staff College, Sand-
hurst.] And the same author tells us (Sec. 26, p. 13) that Newton's
first law is: "Every body continues in its state of rest or of uniform
motion in a straight line except as it is compelled by forces to change
that state." This court said in Valley Spring Hog Ranch Co. v.
Plagmann, 282 Mo. 1, 220 S. W. 1, 15 A. L. R. 266, speaking of the
laws of hygiene: "In this country the knowledge of the school
child is the knowledge of the public, as well as the knowledge of
the legislator or jurist." [220 S. W. 1. c. 3.] So, too, we may say
that school children and the general public understand in a prac-
tical way, if not in scientific terms, the great principles of Sir Isaac
Newton, first published to the world in 1686. Appellant recognizes
these laws of nature by ascribing the slipping of the plank to "vi-

bration or otherwise,'' from a cause for which the service company is not responsible. What was this other cause? We do not know and the evidence does not warrant an inference of any cause that was wholly independent of the street car. We know and respondent's theory does not explain that both the barrel and the plank were hurled westwardly in uniform motion and in a straight line parallel with the direction of the moving car and came to rest in alignment with each other, the barrel some feet in front of the paint-smeared end of the plank. In our opinion the demurrer of appellant St. Louis Public Service Company properly was overruled.

II. Appellant, Fehlig-Ferrenbach, Inc., in support of its demurrer, argues that, even if the evidence had been sufficient to justify a finding that that corporation had placed the plank of the barrier in the position in which it was at the time of the accident, nevertheless the negligence of appellant St. Louis Public Service Company, and not the negligence of Fehlig-Ferrenbach, Inc., was the proximate cause of the accident. This appellant quotes the rule stated in 45 Corpus Juris, 931, as follows: ''A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, and efficient cause of the injury, even though such injury would not have happened but for such condition or occasion.'' Applying this rule this appellant argues that ''the presence of the barrier or plank across or in close proximity to the track was merely a condition by which the injury was made possible, but the intervening, efficient and proximate cause of such injury was the negligence of the motorman of the street car company in operating his street car into this plank or barrier.''

Appellant's citation from Corpus Juris quoted above is by way of exception to and a distinction of general rules which we believe to be applicable here. One of these general rules is (45 C. J. 924): ''Where several causes producing an injury are concurrent and each is an efficient cause without which the injury would not have happened, the injury may be attributed to all or any of the causes, and recovery may be had against either or all of the responsible persons, although one of them was more culpable, and the duty owed by them to the injured person was not the same.'' And concurrent causes are defined to be ''causes acting contemporaneously and which together cause the injury, which injury would not have resulted in the absence of either.'' [45 C. J. 925.]

This court, in Carr v. St. Louis Auto Supply Co., 293 Mo. 562, 239 S. W. 827, held that the trial court properly instructed on concurrent negligence, the facts showing that an automobile in which

plaintiff was a passenger, swerved to avoid a collision with defendant's negligently operated truck and that in so swerving the automobile ran into a depression in a negligently maintained public street and upset injuring plaintiff. This court held that the acts of negligence of defendant in operating its truck and of the city of St. Louis in permitting a public street to be defective were concurrent. Reference is made to that opinion (239 S. W. l. c. 829)., for a definition of concurrent negligence adopted from Shearman and Redfield on Negligence (6 Ed.), section 122, and to eleven Missouri cases cited for their approval and enforcement of the definition there given. In our opinion, the acts of negligence of the Public Service Company's motorman were concurrent with the acts of negligence of the contractor's servants and were not an intervening and solely efficient proximate cause, acting upon the condition of the barrier, created by the appellant contractor.

The facts here bear a close resemblance to the case of Hunt v. Missouri Railroad Company, 14 Mo. App. 160. Plaintiff's husband, a passenger on the back platform of one of defendant railroad company's street cars, running along Olive Street in St. Louis, was killed by a falling derrick which defendant Higgins had erected on the sidewalk for the purpose of reconstructing a building. The derrick was secured by two guy ropes which passed over the street car tracks from the top of the derrick to posts on the other side of the street. A stay rope, also fastened to the top of the derrick, was tied to a piece of scantling inside of the building in front of which the derrick stood. The derrick had been in use in this place for several months prior to the accident in suit, and street cars had been passing regularly beneath the guy ropes. But about fifteen minutes before the arrival of the car on which the deceased was a passenger the derrick was moved a few feet and the west guy rope was attached to another post on the opposite side of the street. The driver of car No. 93, seeing another car of greater height pass safely under the readjusted guy ropes, drove his car forward. But when car 93 came sufficiently near, its roof caught and pulled the west guy rope causing the derrick to fall upon the back platform of the car and to kill the passenger. Plaintiff recovered judgment against the street car company and Higgins, the builder. The judgment was affirmed.

The question of proximate cause was raised, Higgins, the builder, contending (as does appellant Fehlig-Ferrenbach, Inc., here) that the trial court erred in holding him liable for the car driver's negligence, which was the active cause of the injury. Of this defense the St. Louis Court of Appeals said (14 Mo. App. l. c. 165): "The theory upon which the plaintiff here sued and recovered was that the acts of negligence which caused the death were not merely concurrent, but cooperative and interdependent, as between the two

defendants and the doings of each. Thus, the supposed negligence on the part of defendant Higgins, in leaving the guy ropes too low, or in insufficiently mooring by the stay rope and scantling within the building, would have been harmless but for the negligence of the car driver in driving against the guy, instead of stopping when he reached it. On the other hand, no amount of reckless and rapid driving would have done injury without the cooperative negligence which misplaced the guy rope and left the stay rope fastening too weak to withstand the shock of the car running against the guy. Certain it is that the acts or omissions of both defendants, whether negligent or not, were necessary to effect the injury for which the plaintiff sues.''

In the instant case, Mr. Werthmueller, superintendent of Fehlig-Ferrenbach, Inc., who caused the barriers to be erected, had four purposes in mind namely, (one) to keep vehicles from the freshly laid cement on the south lane of Washington Avenue; (two) to exclude all traffic except wayfarers on the cross-walks from the Taylor Avenue intersection; (three) to fend from the fresh cement surface on the south half of Washington Avenue automobiles and wagons which might pass along the car track and (fourth) to leave clearance for the street cars. In order to make sure of the attainment of his third purpose, Mr. Werthmueller caused ropes to be stretched parallel with the tracks, from barrier to barrier. It is obvious that there were possibilities of encroachment of the third objective upon the fourth. The zeal to protect the fresh cement surface might lower the proper degree of caution for a safe clearance. It is also clear that acts of negligence of the two appellants arising out of the positions of the barriers and the operating of the street cars would be, and in the circumstances of this case, were, as in the Hunt case, concurrent, cooperative and interdependent. We have read the authorities cited by appellant, Fehlig-Ferrenbach, Inc., in support of this assignment and find that they are not in point. [They are Kappes v. Brown Shoe Company, 116 Mo. App. 154, 90 S. W. 1158; Steenbock v. Omaha Country Club (Neb.), 195 N. W. 117; Furlong v. Roberts, 150 N. Y. Supp. 166; Johnson v. Mallory (Neb.), 243 N. W. 872; Evans v. City of Des Moines (Iowa), 151 N. W. 397; Wolff Manufacturing Co. v. Nelson (Ill.), 38 N. E. 694.] We find that the trial court rightly overruled the demurrer of appellant Fehlig-Ferrenbach, Inc.

III. Both appellants assign error to the main instruction given on behalf of respondent. This Instruction No. 1 hypothesized the ownership and operation by appellant St. Louis Public Service Company of the street car, and the striking of respondent by the plank as a result of a collision of the street car therewith, and further informed the jury that if they should find ''that immediately before

said collision if you so find, said plank was on, over, or so near said street railway track, as to render said collision therewith, if you find there was such collision, either certain or probable, unless avoided by the motorman in charge of said car, and that said motorman either saw, or by the exercise of ordinary care could have seen, said plank, and that it was in danger of collision with said street car, if you find there was such collision, in time, by the exercise of ordinary care, and with safety to passengers on said car, to have stopped the same and thereby have avoided said collision with said plank, and injury to plaintiff, if you so find, or that said motorman could, by the exercise of ordinary care, have so operated or run said car at a rate of speed which would have enabled him to have passed said plank without injury to plaintiff, if you find that said car collided with said plank and injured plaintiff, as aforesaid, and failed to exercise such care, and thereby injured the plaintiff, then your verdict will be against defendant, St. Louis Public Service Company, and in favor of the plaintiff.''

. The remainder of the instruction deals with the question of liability of appellant Fehlig-Ferrenbach, Inc. The latter appellant, while assigning error generally to the instruction, does not specify wherein it is faulty nor does it argue or brief the assignment. We see no error in the part of the instruction relating to the contracting company and therefore we overrule its assignment.

St. Louis Public Service Company complains that Instruction 1 is broader than the evidence and authorized the jury to find facts unsupported by the evidence. The contentions upon this point, for the most part, are repetitions of the arguments which the same appellant advanced in support of its demurrer, and heretofore examined in this opinion.

The first objection to the instruction is that it permitted the jury to find that ''immediately before said collision'' the plank was ''on, over or so near said street railway track'' as to render a collision therewith ''either certain or probable,'' when there was no evidence to support such findings. In view of our ruling upon the demurrer, we find that this objection is not well taken. It rests upon the theory that there was no evidence that the motorman knew or in the exercise of ordinary care could have known of the peril of a collision.

The next objection is that without supporting evidence the instruction authorized the jury to find that the motorman saw, or by the exercise of ordinary care, could have seen the plank in danger of collision with the street car in time either to have stopped the car or to have so operated or run the car at a rate of speed as would have enabled him to have passed the plank without injury to respondent. We have seen that the allegation of negligence, general in its terms, permitted evidence of any particular negligent opera-

tion of the car. This permissible scope of the evidence included the issue of timely stopping and of careful rate of speed in passing. We have noted the testimony that, at a distance of one-half block east and west of the place of the accident, the car was going at high speed. This direct testimony warranted the inference that, at the moment of collision, the car was moving at a negligent rate of speed. In the case of Bergfeld v. Kansas City Railways Co., 285 Mo. 654, 227 S. W. 106, from which we have quoted briefly, defendant objected that plaintiff's main instruction was broader than the pleadings. Reference is made to the illuminating discussion of the question there involved, for further light upon the problem presented here. This assignment is ruled against the appellant making it.

IV. Appellant, St. Louis Public Service Company, complains that there is prejudicial error in respondent's Instruction 6 on the measure of damages and that the verdict is excessive. The examination of these assignments requires a statement of the proof touching respondent's injuries, the necessary and reasonable expenses paid and incurred and the loss of earnings. Respondent suffered a comminuted fracture of the tibia, which is the large bone of the leg below the knee, and a fracture of the fibula, which is the small lower leg bone. The fibula was broken a few inches above the ankle and the tibia, about one-third up. A comminuted fracture, in this case of the large lower leg bone, means a breaking off of pieces of bone. As a result of the separation and projection of small pieces of the large bone, there was a lump or swelling of the flesh against which the bone pieces pressed. He was obliged at the time of the trial to wear a steel brace, fastened to his shoe, as a support for the leg just below the knee. It was also necessary for him to wear a splint, without which he could not walk. He also used crutches, but at the time of trial he was experimenting at doing some walking without them.

Respondent was in hospital from October 24, 1929, the date of his injury, to March 29, 1930, and had his leg first in a box splint and next in a cast. Dr. John H. Armstrong, his family physician, who together with Dr. Ralph E. Gaston, performed the necessary surgical work of setting the broken bones, testified that respondent suffered a severe shock from the injury, and that the doctor was able to observe a change in his nervous system. Respondent was seventy-two years old at the time of the accident, and he was not given an anaesthetic prior to the bone-setting. Dr. Armstrong stated that there was a reasonable probability that a chip of bone discernible in X-ray pictures might come through at any time, despite appliances used to prevent that happening. In that event it would be necessary for a surgeon to cut off the exuding bone and also to take out any dead bone that might be in the leg. Both Dr. Armstrong

and Dr. Gaston testified that respondent's injury was permanent and that his ability to walk about was impaired. Respondent testified that he had to keep his leg at a certain angle in order to prevent the protruding bone from pressing against the covering of flesh and skin. If he should turn the foot the wrong way he would suffer pain.

It was shown that the hospital bills, doctors' charges and costs of appliances amounted to $2,172.35 and that these expenses were reasonable and necessary. Respondent Byars testified that, at the time of his injury he was a professional writer and that he had been a newspaper man since 1878. His revenue-producing work averaged between $500 and $800 a year, but he had not been able to earn any money from the date of his injury, October 24, 1929, to the date of the trial, December 18, 1930.

Appellant, St. Louis Public Service Company, assigns error to the instruction on the measure of damages for the reason that it authorized an allowance for future expenditure for medical, surgical and hospital treatment, although the evidence failed to show with any reasonable certainty that respondent would be required to incur any such expense on account of his injuries. This objection does not take into account the testimony of Dr. Armstrong that there was a reasonable probability that a piece of bone which could be felt beneath the flesh and could be seen in X-ray pictures might come through the skin at any time, and in that event, that the protruding bone and any dead bone that might be found in the leg would have to be removed. This testimony raised a reasonable probability of future medical, surgical and hospital treatment.

The Public Service Company further objects that Instruction 6 authorized an allowance for future loss of earnings when there was no evidence that respondent, a professional writer, would sustain such loss as a result of his injuries. Respondent himself testified that he had been unable on account of his injuries to earn any money in the practice of his profession during fourteen months from the date of his injury to the day of trial. The testimony of the physicians warranted the conclusion that respondent, at the time of trial, was as nearly back to his normal physical condition as he might ever hope to be. While a professional writer would not be as disabled to earn a livelihood by reason of permanent injuries of the nature which Mr. Byars suffered, as would a building mechanic or other craftsman, yet a writer or a man of any profession would suffer some impairment of earning capacity on account of those injuries. For not merely were Mr. Byars' leg bones broken and a permanently crippled condition created, but his nervous system suffered and he endured at times pain and loss of sleep and he may reasonably expect to have to bear these added afflictions in the

future. For these reasons we find no reversible error in the objections to Instruction 6.

V. Respondent's age, seventy-two years at the time of trial, and his short life expectancy, would prompt us to say that the verdict of $10,000 was excessive but for one fact. That is the testimony that the necessary expenses incurred by reason of the accident and the earnings actually lost during fourteen months prior to the trial amounted approximately to $3,000. This sum, deducted from the verdict, leaves $7,000 which does not appear to be excessive compensation for permanent injuries suffered by respondent. While prior cases are merely advisory and are not controlling on the question of excessive damages allowed for personal injuries (Kleinlein v. Foskin, .321 Mo. 887, 13 S. W. (2d) 648), we do not hesitate to say that we reached the conclusion stated without other guidance than the six decisions of this court which appellant service company cited in support of its argument that the verdict was excessive. We mention one of those cases which appears to be most nearly in point. In the case of Brucker v. Gambaro (Mo.), 9 S. W. (2d) 918, this court held that a judgment for $10,000 was excessive and ordered a *remittitur* of $2,000. The plaintiff in that case was seventy-two years old (the same age as respondent here), and suffered a fractured femur of the right leg and a consequent shortening of that limb by three-quarters of an inch together with a stiffening of the right knee joint so that the flexion thereof was eighty per cent of normal. The court in ordering a *remittitur*, took into account not only the age and short life expectancy of the plaintiff, but his failure to seek recovery for loss of earnings, present or future, and his apparent recovery and ability to get about without the use of crutches or other aid to locomotion. No items of hospital and surgical expenses were factors in the measure of damages, the plaintiff in that case having been a patient in the St. Louis City Hospital, a municipally maintained institution. In this case we have expenses and lost earnings as elements of damages.

No reversible error appearing the judgment is affirmed as to both appellants. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.