EDWARD F. KLOTSCH v. P. F. COLLIER & SON CORPORATION, a Corporation, and ELMER U. McATEE, Appellants.—159 S. W. (2d) 589.

Court en Banc, March 10, 1942.

*Moser, Marsalek & Dearing* for appellants.

42

*N. Murry Edwards* and *Fred R. Rodgers* for respondent.

ELLISON, J.—Respondent, Klotsch, recovered a judgment against appellants in the circuit court of the City of St. Louis for $9,601.94 damages for personal injuries sustained when he was struck by an automobile driven by appellant McAtee, an employee of appellant P. F. Collier & Son Corporation (hereinafter called "Colliers"), on Saturday evening, November 5, 1938, about 7 p. m., while walking across Olive Street Road in St. Louis County. McAtee was employed by Colliers as a collector of subscriptions to their publications, and to verify new subscriptions. The place where the collision occurred was in his territory. Respondent called him as a witness and he testified he had finished his week's work on the afternoon of that day, and was on a personal mission of his own at the time of the casualty. The only two assignments of error on this appeal are: (1)

that there was no substantial evidence to support a verdict against Colliers because it conclusively appeared McAtee was not acting in the scope of his employment when the collision occurred; (2) the verdict was excessive.

Respondent's case was submitted to the jury solely on the humanitarian doctrine. But since neither appellant contends the evidence failed to make a prima facie case of liability against appellant McAtee, and the only question is whether appellant Colliers was liable for McAtee's negligence under the doctrine of *respondeat superior*, we need not detail the circumstances of the casualty. It is necessary, however, to state fully the facts bearing on the terms of McAtee's employment and the nature of his mission when the casualty happened.

He had worked as a collector for Colliers for about three years. His compensation under the contract in effect at the time was derived wholly from commissions on collections and stipulated sums for subscriptions verified. He had a territory in the western portion of St. Louis County which included the point where the collision occurred and extended over into St. Charles County as far as Wentzville, St. Charles and intermediate villages. He had a traveling expense allowance of 3c per mile between certain towns, in which he worked, and 75c ferry fare across the Missouri River at St. Charles. When he was employed he was asked whether he had an automobile and was told an automobile would be helpful in his work. The advertisement answered by him when he obtained the job so stated. He was further required to furnish Colliers with a full description of his automobile. But he was not required to use one in the business and could have traveled by bus or other conveyances, and still drawn the same travel allowance.

On the first of each month Colliers would give him from 700 to 900 subscription contracts on which he was expected to make collections or verifications during that month. But he arranged his own routes and fixed his own working hours. He reported to the central office by telephone every morning and personally called at the office each Saturday morning at 8 o'clock for instructions. He often made collections at night. He would send in a report almost every day and would mail remittances by money order. His list included five subscribers on the Olive Street Road and he had had 9 or 10 accounts in Wentzville for three or four months. It had been his custom to make collections on these about once a month, usually between the 5th and 7th of the month.

McAtee, testifying as a witness for respondent, said he worked in St. Louis County the day of the casualty and completed his collecting about 3 o'clock in the afternoon. Then he went home and made out his report for the day and mailed it. He and his wife had arranged to spend the week end with her parents at the latter's home near

Wright City in Warren County about 13 miles west of Wentzville, both cities being on U. S. Highway No. 40. About 6 o'clock that evening they started to Wright City in his automobile, going over the Olive Street Road, which was the most practical route to both Wentzville and Wright City because the alternate route through St. Charles entailed payment of the ferry fare. But McAtee swore he had no intention of transacting any business for Colliers at Wentzville or elsewhere on that going trip. However he did intend, after having spent the week end at Wright City, to return to Wentzville the next Monday morning (more than 36 hours in the future) and begin work there. For that reason he took with him all lists and records necessary to transact his business at Wentzville, St. Peters and St. Charles. It may have been that he had all the cards and contracts upon which collections or verifications were to be made that month. The witness' testimony is confused on that point.

After the collision he was taken to the sheriff's office and released about 10 o'clock or 11 o'clock that night. He proceeded to Wright City and remained with his wife's family, as planned, until Monday morning, November 7, when he began work at Wentzville about 12:35 P. M. He waited until that hour because it had been raining. From there he went on to St. Peters and St. Charles and returned home Monday night. In his report for Monday, November 7, he claimed mileage on the going trip of November 5, as far as Wentzville, from the last allowable point he had visited the previous week, and also on the return trip from Wentzville.

One of respondent's counsel obtained a written statement from McAtee on November 8, three days after the casualty, in which the following appears: "At the time I was proceeding out to Wright City, Mo., where my wife's family reside. We intended to spend the night there and then I expected to do some collecting in the vicinity, which I have done at this time. I have to provide my own car on my job. . . ." McAtee further testified at the trial that he didn't call on customers on Sunday, whereupon respondent introduced two exhibits purporting to show he had taken two 60c subscriptions at Wentzville on October 9, which was Sunday, about a month previous to the date of the casualty. The witness said he thought the "9" in the dates had been changed and that the numbers of those two subscriptions appeared on his daily report for October 7, 1938, though he usually dated such reports the day the subscription was actually taken.

Harry Werner, another witness for respondent had worked for Colliers from July, 1935, to May, 1938. He said he was required to use an automobile, as were the 15 to 18 other collectors, except one who worked in St. Louis; that the company's instructions were to start work early in the morning; and to work in the evening and even on Sunday if necessary. Once he was asked to work on July 4. He

further said if the collectors were in St. Louis (for conferences, as we understand) the company usually instructed them to leave Sunday so as to be in their territories Monday to begin work. This witness had a territory more remote from St. Louis than McAtee's. He had worked some in St. Louis, but also in Southern Illinois, Iowa and in Missouri as far away as Jefferson City, Columbia and Boonville. We do not understand him to mean that the company required a man to start out on Sunday if his territory was close to St. Louis. He said nothing about that. McAtee lived in St. Louis, and we take judicial notice that Wentzville is about 35 or 40 miles from that city, depending on the destination therein.

Respondent cites nine cases of which Borgestede v. Waldbauer, 337 Mo. 1205, 1209-10, 88 S. W. (2d) 373, 374, and Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 528(3), 66 S. W. (2d) 903, 907, are types. They hold the employer of a traveling salesman will not be exempted from liability for the latter's negligence in the prosecution of his duties, merely because it arose through the operation of *his own* automobile, when the use of such instrumentality was with the express or implied assent of the employer.* Both cases further rule that a salesman returning home from a journey on behalf of his employer after the actual sales or collection work is over, is still acting within the scope of his employment. Another decision, LaFleur v. Poesch, 126 Neb. 263, 275, 252 N. W. 902, ▮ 907, is stressed by respondent. In that case a traveling salesman, finding the stores closed in one of the towns on his route, went on to his home town to spend the night intending to return to the other place the next morning. The accident involved happened on that trip home. The decision held: ''Although the trip might have been taken in part for his own convenience and his desire to be home that evening, we think the facts shown by the record presented a question for the jury.''

. Respondent says these cases are in point here, and asserts the fact that McAtee made the trip through Wentzville to Wright City on Saturday night for his own pleasure and didn't intend to begin work for Colliers at Wentzville until Monday morning, some 36 hours later, made no difference—this because he charged Colliers mileage for that going trip as far as Wentzville and traveled the logical route to the latter town, he being authorized to fix his own hours of work and, in fact, expected to work at night and on Sunday when necessary. Appellants distinguish the above mentioned cases cited by respondent, and say the time element makes a vital difference. They refer us to

*The Borgstede case later was overruled in Riggs v. Higgins, 341 Mo. 1, 10, 106 S. W. (2d) 1, 5, if and insofar as it appears to hold the employer's mere *knowledge* of the employee's business use of his own automobile, alone will support an inference that the employer directed the use of such automobile or reserved a right of control thereover. That question, however, did not arise in the instant case.

five cases and we add a few others, all cited in the margin,* to which we shall refer as necessary in the succeeding discussion.

 If Colliers are liable in this case under the doctrine of *respondeat superior* it can only be, as the Pesot case holds, because McAtee was acting within the scope of his employment at the *time and place* of the casualty in respect of the very transaction out of which the injury arose. If the deviation of an employee from his authorized course be only slight or incidental, the employer may still be liable, as held in the Guthrie case. If the materiality of the deviation be a question on which reasonable minds may differ, it is a matter for the jury to decide. But if the departure from the employer's business be of a marked and decided character and the evidence is not conflicting, it is a question of law for the court, as the Gosselin case holds. The ultimate question always is whether the servant was transacting the master's business and the latter had a right to control his physical activities at the time.

 In the instant case McAtee's trip served a double purpose. It put him closer to Wentzville where he intended to resume work for Colliers 36 hours later; but it would not have been worth while if he had not also been going to Wright City that night for his personal pleasure. He had a right to fix his own working hours. These circumstances bring the case within the holdings in the McMain and Mullally decisions. In the former, McMain motored from Sedalia to Kansas City partly to deliver some payroll reports, which he usually mailed, and partly for his own pleasure; and was accidently killed on the return trip. The trip was made in an automobile furnished by the employer; at least it furnished the gas, oil, tires and repairs. He had no regular hours of work. The Workmen's Compensation Commission denied compensation. This court held there was substantial evidence to support that conclusion, and stated the rule of decision by quoting the following (and more) from Marks v. Gray, 251 N. Y. 90, 167 N. E. 181: "If the journey would have gone forward though the business errand had been dropped, and would have been cancelled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk."

The other case—the Mullally case—was a damage suit tried to a jury. Mullally was employed by a grain company which furnished him a business automobile, the same being maintained by the company and they paying for the gas and oil. He and his wife drove

*Guthrie v. Holmes, 272 Mo. 215, 236-7, 198 S. W. 854, 859(3); State ex rel. Gosselin v. Trimble, 328 Mo. 760, 768, 41 S. W. (2d) 801, 805; Pesot v. Yanda, 344 Mo. 338, 343 et seq., 126 S. W. (2d) 240, 242 et seq.; Snow-white v. Metropolitan Life Ins. Co., 344 Mo. 705, 710, 127 S. W. (2d) 718, 721; Mullally v. Langenberg Bros. Grain Co., 339 Mo. 582, 589 et seq., 98 S. W. (2d) 645, 647 et seq.; O'Dell v. Lost Trail, Inc., 339 Mo. 1108, 1115(1), 100 S. W. (2d) 289, 292; McMain v. J. J. Connor & Sons Const. Co., 337 Mo. 40, 85 S. W. (2d) 43; Humphrey v. Hogan (Mo. App.), 104 S. W. (2d) 767; See also 122 A. L. R. Annotation, pp. 873, 885 X.

in that car from St. Louis to the lodge of some friends in St. Charles county to spend the week end. He cancelled a golf engagement for Saturday afternoon to make that trip. On their return his wife was injured through his negligent driving of the car, and she brought the action against his employer under the doctrine of *respondeat superior.* The evidence showed that while the visit was partly recreational and social, yet it was within the scope of Mullally's duties to range through the country examining crop conditions. There was testimony that he did drive slowly at times on that particular trip to observe the maturing corn, and once stopped to inspect a field of corn by the roadside. Plaintiff recovered a judgment for $18,500 in the circuit court, which Division 1 of this court reversed outright on authority of the McMain case, holding that whatever business purpose may have tinctured the trip was merely incidental.

In the Humphrey case the employer and employee were sued for the negligence of the latter resulting in an automobile collision, while on a 12 mile detour returning from a business trip, the detour being made so he and his wife could spend the week end with her parents. He was using a truck provided by his employer, on which the latter paid operating expenses—maintenance, gas and oil. At the time the employee had with him a business book which would be needed that night at his destination, and also some groceries to be peddled the next day. The Kansas City Court of Appeals held these facts did not work any material change in his relation to his employer and reversed a judgment for plaintiff. This holding was quoted and followed in the Pesot case, which, also, was reversed outright.

Under the rule announced in the McMain case and followed in the Mullally case, and in view of the holding in the Humphrey case, we think the respondent clearly failed to make a substantial showing against Colliers. It is true that McAtee was within his territory when the casualty occurred and that he charged Colliers mileage for the use of his own car on that trip. But he was not in the territory for any business purpose, and the mileage he charged was simply traveling expense for the part of the trip that would be advantageous to Colliers the following Monday. In all three of the cases reviewed in the last three paragraphs the facts were stronger in favor of the plaintiff because in those cases the employee did not even own the car involved. It was furnished by the employer together with maintenance and running expenses. And under the Humphrey case it makes no difference that McAtee had with him the records he would need 36 hours later when he resumed his work. Neither would the fact have a bearing that McAtee had taken two subscriptions in Wentzville on Sunday about a month before (as indicated by respondent's two exhibits) because he could choose his own hours of work and on this occasion was not intending to work on Sunday and

did not do so. Respondent's witness Werner added nothing to the strength of his case.

Respondent had no substantial evidence on the issue under discussion except the testimony of appellant McAtee, whom he used as a witness. It was unfavorable to respondent, but respondent insists he is not bound by it because McAtee was an adversary party and unfriendly. On that point he cites six cases. Two of them hold greater liberality is allowed in the cross-examination of an unfriendly witness. Three discuss the question as to when a party may impeach his own unfriendly witness on the ground of entrapment or surprise. All these five cases accord in principle with the universal rule that a party must prove his case by substantial evidence, and should not be permitted to submit the cause to the jury merely because his own unfriendly witness has testified against him. In other words the fact alone that the testimony of the adversary witness is unfavorable will not support a substantial inference that the contrary is true, where there is nothing in his testimony or that of some other witness tending to prove the opposite version.

This is illustrated by the sixth case cited by respondent, Smith v. K. C. Pub. Service Co., 328 Mo. 979, 991, 43 S. W. (2d) 548, 553(4), where it was said: "The fact that the motorman was plaintiff's witness does not make all that he testified to conclusive upon plaintiff. The facts may be shown to be otherwise *by other evidence.*" (Italics ours.) This Smith case cites Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667, 675, 187 S. W. 1165, 1167, where plaintiff used defendant's engineer as a witness. This court said: "There can be but little doubt that, if the engineer's evidence is to be accepted as the *only* probative evidence, the plaintiff cannot recover." But the opinion continued that plaintiff was not thereby precluded from establishing his case by other testimony even though it contradicted the engineer's testimony, and held the plaintiff had done so. Without question a party is bound by the uncontradicted testimony of his adversaries which he introduces. [Orlann v. Laederich, 338 Mo. 783, 790(3), 92 S. W. (2d) 190, 193 (4).] We so hold here.

Finally, on this branch of the case respondent asserts Colliers are estopped to dispute that he made a substantial showing for the jury. This contention is based on the following facts. Respondent's petition contained several assignments of negligence. At the close of the whole case Colliers offered a general demurrer to the evidence, which was overruled. Respondent then abandoned his other pleaded assignments of negligence, and submitted the cause to the jury on the humanitarian doctrine alone. Colliers asked and obtained a converse instruction on that doctrine, which referred to (respondent says: "adopted and resubmitted") respondent's instruction No. 1 on the same issue. The theory of respondent is that by this course Colliers estopped themselves from asserting there was no sub-

stantial evidence against them on the humanitarian issue. As authority for that position he cites Torrance v. Pryor (Mo. Div. 1), 210 S. W. 430, and five other cases, all of which were decided by the Courts of Appeal except one, Consolidated School Dist. v. West Mo. Power Co., 329 Mo. 690, 705, 46 S. W. (2d) 174, 180.

The Torrance case supported the theory now urged by respondent, but it was overruled by Elkin v. St. Louis Pub. Service Co., 335 Mo. 951, 954(1), 74 S. W. (2d) 600, which has been followed in five subsequent cases since it was decided in 1934. The reasoning of the Elkin case is that a general demurrer to the evidence challenges the sufficiency of the evidence on every theory of liability alleged in the petition, including the specifications on which plaintiff elects to stand; and that on the overruling of his demurrer the demurrant does not waive his point by submitting converse instructions on the issues submitted because he is *forced* to adopt that course by the adverse ruling on the demurrer. Even if the Consolidated School District case cited by respondent were in point, it would not control over the Elkin case, later decided. But it is not in point. It merely decides that where a plaintiff submits his case under instructions embodying an erroneous theory, the defendant waives the error by adopting the same theory of submission. That, of course, only applies to situations where the defendant joins in the error without coercion. We hold that respondent did not make a case for the jury as against Colliers.

In view of our holding just made, the next and final assignment affects only the appellant McAtee. It is that the verdict for respondent for $9601.94 was excessive. Respondent was 75 years old in May, 1939. He had lived on his 18-acre home place on Olive Street Road for about 67 years and operated a truck garden and small farm, working all the time. His gross income from the business was about $1000 per year, of which $200 was net, plus provisions and support for his family. His hospital and medical expense totaled $601.94. This indicates the jury allowed him $9000 for loss of earnings, physical injuries, pain and suffering. The injuries sustained were a broken left leg, a sprained ankle, a punctured lung, concussion of the brain which caused respondent to remain unconscious or semi-conscious for two days, a moderate sized inguinal hernia on the right side, a wrenched shoulder, and numerous bruises and contusions.

The leg injury was painful and permanent. It consisted of a comminuted fracture of the upper end of the fibula, involving the joint. The knee joint was dislocated and both bones of the lower leg were pushed forward over the knee and up into the front part of the thigh for a distance of three or four inches. The knee cap was elevated. On May 9, 1939, the day before the trial, there was a definite stiffening of the left knee so it could only be flexed about 80 degrees—less than a right angle. The knee joint was loose so the lower leg could be moved laterally or sideways 5 to 8 degrees. There was

also a definite increase in the size of the left leg from the middle thigh down to the calf of the leg, varying from ½ to 1 inch in diameter. The doctor said there was no doubt about the permanency of the knee injury resulting in loss of stability in that leg which would disqualify respondent for manual work on a truck farm,

The motility of the left ankle joint was only about 30%. Respondent was taken to the hospital on November 5, 1938, the date of the casualty and remained there about ten days. He was taken back on January 3 when the doctor performed an operation to repair the hernia. He had had a rupture in the same place about a year before. He remained in the hospital until January 29. The brain concussion in the opinion of the doctor might account for the headaches of which respondent complained. He testified he couldn't get around without crutches, suffered continual pain in his knee and left ankle; that he was nervous and couldn't close his left hand; that his sleep was light and broken; and that someone had to help him put on his socks and lace his shoes, and he had to get help when taking a bath. The lung puncture had healed.

The respondent's expectancy under the American Experience Tables of Mortality was 6.68 years. Under the annuity table in Sec. 3522, R. S. 1939, Sec. 3132, Mo. Stat. Ann., p. 5174, the present value of his annual net earnings at the time of his injury was $952, not counting the family support. It is true his earning power probably would decline during his last years, but it seems this would be offset by the omission from the calculations of his income devoted to family support. This leaves about $8,000 as the amount allowed for physical injuries, pain and suffering.

Appellants cite two decisions which they say call for a reduction of the verdict in this case: Osby v. Tarlton, 336 Mo. 1240, 85 S. W. (2d) 27, and Johnston v. City of St. Louis (Mo. App.), 138 S. W. (2d) 666. In the Osby case the plaintiff was 32 years old and earning over $1,000 per year. His injury was a compound comminuted fracture of the patella which permanently stiffened the left knee reducing the flexion about 25%. A verdict for $10,000 was reduced to $6,000. In the Johnston case the plaintiff was 55 years old but his earnings are not shown. The injury was a comminuted fracture of the right femur near the hip, resulting in a slight deformity of the neck of the femur, pain, necessary use of a cane in walking a year and a half afterward, inability to perform manual labor. A verdict for $6,000 was reduced to $5,000.

Respondent cites two cases where the plaintiff was 72 years old and the injury was a leg fracture. These are Byars v. St. Louis Pub. Service Co., 334 Mo. 278, 294-6, 66 S. W. (2d) 894, 902-3, and Brucker v. Gambaro (Mo.), 9 S. W. (2d) 918, 922. In the Byars case the injury was a comminuted fracture of the tibia and a fracture of the fibula, which required the plaintiff to wear a steel brace

fastened to his shoe, a splint, and to use crutches which he was attempting to lay aside when the case was tried. The opinion found the part of the $10,000 verdict allowed for these injuries (outside of lost earnings and medical expenses) was $7000 and held it was not excessive on authority of the Brucker case. In the Brucker case the 72-year-old plaintiff suffered a compound fracture of the right femur about the knee joint with a consequent shortening of that leg 3/4 of an inch and a loss of flexion in the right knee of 20%. A verdict for $10,000 was reduced to $8,000. Considering the fact that the respondent in this case in addition to the leg injury also suffered a sprained ankle, a punctured lung, concussion of the brain and an aggravation of a pre-existing rupture necessitating an operation, as well as about $1,000 loss of earnings and a $600 outlay for medical expenses, we have concluded the verdict for $9601.94 is not excessive.

For the reasons stated the judgment is reversed as to the appellant P. F. Collier & Son Corporation, and affirmed as to the appellant Elmer U. McAtee.

PER CURIAM:—The foregoing opinion by ELLISON, J., in Division Two is adopted as the opinion of the Court en Banc. All concur.

PER CURIAM:—Respondent has filed a vigorous motion for rehearing. One assignment asserts he made a prima facie case, but that our opinion permits it to be swept aside by a single statement of his unfriendly witness, the appellant McAtee. McAtee's statement was that in making the Saturday night trip to Wright City through Wentzville his only purpose was to spend the week end with his wife's parents, and that he had no intention of transacting any business for his employer along the road, or at Wentzville until the following Monday morning 36 hours later. For the reasons stated in the opinion we think respondent was bound by this testimony because he called and used McAtee as his own witness. We concede that if there had been any substantial evidence to the contrary respondent could have taken advantage of it. But there was none.

The two exhibits introduced by respondent purporting to show McAtee had taken two 60c subscriptions for Colliers' publications at Wentzville on Sunday, October 9, did not substantially tend to prove he regularly transacted business on Sunday or that he intended to do so on the trip on November 5. For it was undisputed that he arranged his own routes and working hours. Also, it was conceded that McAtee had had 9 or 10 accounts at Wentzville for several preceding months; but there was no evidence that he had ever transacted any business there on Sunday—unless on the one occasion mentioned. McAtee himself disputed that, and his daily reports showed the two subscriptions were taken on October 7 instead of October 9, in line with his custom to work at Wentzville between the 5th

and 7th of each month. The 5th in this instance (November 5, 1938) fell on Saturday, and according to all the evidence he was occupied in St. Louis county until late that day. Since all this appeared from respondent's own showing, his contention on this point must be disallowed. A verdict cannot be founded on pure speculation.

The other assignment is that under the law McAtee was on a mission for his master, Colliers, enough to make the latter liable for his negligence, even though his version be true that he did not intend to work until Monday morning, 36 hours later. We think a substantial "detour" in time, as well as space, may relieve a master from liability for the negligence of his servant, for the law is well settled that the servant must be acting within the scope of his employment at the *time and place* of the casualty. If a servant having business to transact for his master at a given point, unnecessarily and unreasonably, so far as the master's business is concerned, starts out several days ahead for his own purposes (such as private business, sports, vacationing, visiting relatives, etc.) we can see no reason why the master should be liable for his negligence on the way, even though the servant took his business paraphernalia with him and was allowed mileage for the trip. McAtee lived less than forty miles from Wentzville with access thereto by automobile over two state highways. There was no business reason for him to start out 36 hours ahead and stay at a hotel or the home of relatives until Monday morning. In other words, while the question was not asked in that form, the necessary effect of McAtee's testimony was that the Saturday night trip would not have been made but for the purpose of visiting Mrs. McAtee's parents over the week end.

This brings the case within the ruling in Marks v. Gray, 251 N. Y. 90, 93, 167 N. E. 181, written by Judge Cardozo, and quoted and followed in McMain v. J. J. Connor & Sons Const. Co., supra, 337 Mo. l. c. 43(1), 85 S. W. (2d) 43. Respondent's motion for rehearing says our opinion does not quote enough of the Marks case to show the full import thereof. We quoted only a few lines to save space; but all that respondent sets out in his motion is quoted in the McMain case. According to our construction the Marks case means, as applied to the instant facts, that Colliers would be liable for McAtee's negligence only if the inference be permissible that McAtee would have made the Saturday night trip to Wentzville at or about the time he did, even though the contemplated week end visit with Mrs. McAtee's parents at Wright City had been abandoned. On the other hand, there is no liability if the trip would have been made even though Colliers business had been cancelled before McAtee started, or would not have been made upon failure of the private purpose, namely the week end visit.

Respondent calls our attention to an excellent Comment on "Agency-Abandonment and Re-Entry" by William Aull III in 6 Missouri Law

54

Review, p. 331, which considers the doctrine of vicarious liability in its social or economic aspects; and recognizes the view that industry and business should be made to bear the burden of whatever risks are normally inflicted on the public—without inquiring too strictly into the "scope" of the servant's employment. That may be true, but the law of diminishing returns sets in somewhere and the public must foot the bill. The rule is a rule of reason and was transgressed in this case, we think. For the reasons given here and in the opinion, the motion for rehearing in Division No. 2 is overruled.