**In the Matter of Velma B. BROWN, alleged incompetent, Appellant.**

No. 9964.

Missouri Court of Appeals,
Springfield District.

July 28, 1975.

Motions for Rehearing or to Transfer
Denied Sept. 5, 1975.

Application to Transfer Denied
Oct. 13, 1975.

Arch M. Skelton, Edmund C. Forehand, Skelton & Forehand, Springfield, Laurence H. Flanigan, McReynolds, Flanigan & Flanigan, Carthage, for appellant.

John W. Scott, Grant W. Scott, Spencer, Scott & Dwyer, Joplin, Harold J. Fisher, David L. Smith, Woolsey, Fisher, Clark, Whiteaker & Stenger, Springfield, for respondent.

Before STONE, P. J., HOGAN, J., and FRANK L. COTTEY, Special Judge.

L. F. COTTEY, Special Judge.

Respondent herein,[1] by a petition filed in the Probate Court of Jasper County under the provisions of Chapter 475, RSMo 1969, V.A.M.S., charged that appellant, Velma B. Brown, 71, a childless widow of substantial wealth, was "incapable, by reason of mental illness or other incapacity, of managing her property and caring for herself." The prayer was for appointment of a guardian of her person and estate. The cause was certified to the circuit court where, on trial to a jury, a verdict in favor of the alleged incompetent was returned. A new trial was ordered, however, on the recited ground that "Instruction Number 3 . . . is [an] improper statement of the law and that it constituted reversible error." From that order Mrs. Brown appealed to the Supreme Court on the theory that a constitutional question was involved. The Supreme Court ruled that point adversely to her and transferred the cause to us for disposition of the remaining issues. *In re Brown*, 518 S.W.2d 289 (Mo.1975). With the constitutional question out of the case, three points

---

1. Respondent is identified as David Bruce Adamson, Chairman of the Board and President of the First National Bank of Joplin, Missouri.

urged by appellant remain to be discussed, in this order:

■ 1st: That respondent's evidence in support of the charge of Mrs. Brown's incompetency was so utterly inadequate as to amount to a failure of proof, thus entitling her to a directed verdict in her favor as a matter of law; hence, submission of that issue to the jury, no matter how improper the instructions may have been, was, in effect, a legal nullity on which no error can be predicated by respondent.

We preface our discussion of this point by reminding counsel that in law, in busy courts, a proposition put forward less on faith than in hope is seldom entertained with charity. By application of that maxim we content ourselves with a one sentence summary of the nearly 1,500 pages of transcript accumulated in the six-day trial of this case. Respondent produced a score of witnesses to testify to Mrs. Brown's incomprehensibly eccentric and sometimes violently irrational behavior, among them two accredited psychiatrists who gave it as their opinion from their examination of her that she was "a person of unsound mind . . . mentally ill;" that she had "a very disordered mind . . . a persecution complex . . . a paranoid psychosis . . . a mental illness of a severe nature" with "hypertension" adding to "her confusion" and aggravating "the tendency toward a paranoid condition;" that she might become "very dangerous" and was "in need of psychiatric treatment;" that she "needs to be under supervision;" that because of "her terribly disturbed mind" she "is incompetent to take care of herself" or "properly take care of her financial affairs," because she is unable to "make the proper judgment on such matters;" and, finally, that "she is incompetent because of mental illness." If our rejection of appellant's argument on

this point has unintended overtones of brusqueness, our apology is the welcome brevity of the analysis that prompts it.

■ 2nd: That because respondent put Mrs. Brown on the stand as a part of his own case (as a sort of Exhibit A, one must suppose, since the result of the experiment leaves any other purpose to even more remote conjecture), he "vouched for and admitted that she was in fact competent and not of unsound mind" (having regard for § 491.060, RSMo 1969, V.A.M.S., which disqualifies persons of "unsound mind" as witnesses); hence, that respondent was precluded thereafter from offering proof of her incompetency because, so the argument runs, to permit him to do so would be tantamount to allowing him to impeach his own witness by direct evidence.

■ We find no precedent for that proposition.[2] The argument obviously proceeds upon the assumption that there is a close analogy between a party's vouching for the *credibility* of his adversary whom he calls as a witness in his own case and vouching for his adversary's mental *competency* when he puts him on the stand in a case like this; but even if there were, counsel overstate the effect of the rule in the premised example of its application. One who calls his adversary as a witness in his own case does no more than concede that his adversary's testimony is worthy of belief *if the jury,* in the exercise of its exclusive prerogative in such matters, *sees fit to believe it.* He does not guarantee the *truth* of what his adversary says, nor does he forfeit his right to have the jury pass on that question, nor is he "precluded from proving the contrary by other witnesses." *Manchester Bank of St. Louis v. Harrington,* 199 S.W. 242, 248 (Mo.1917). "Neither is there anything to prevent the plaintiff, after so examining the defendant, from producing

2. For a review of the authorities from other jurisdictions approving the practice complained of here and giving the reasons therefore, see Annot., 22 A.L.R.2d 756 (1952).

whatever evidence he can to show that 'what he says is not strictly in accord with the truth' and leave it to the court or jury 'to place a proper estimate on it.'" *Lolordo v. Lacy*, 337 Mo. 1097, 1101, 88 S.W.2d 353, 355 (1935); *Klotsch v. P. F. Collier & Son Corp.*, 349 Mo. 40, 49, 159 S.W.2d 589, 594 (banc 1942); *Maginnis v. Mo. Pac. Ry. Co.*, 268 Mo. 667, 675, 187 S.W. 1165, 1167 (1916); *Black v. Epstein*, 221 Mo. 286, 304, 120 S.W. 754, 760 (1909); *Imhoff v. McArthur*, 146 Mo. 371, 377, 48 S.W. 456, 457 (1898).[3] One is never "bound" by the testimony of his adversary whom he calls as a witness save where that testimony is the *only* evidence on a point vital to the calling party's case, and even then the term is misleading, for in every such instance it will be found that the calling party, disappointed by the testimony of his adversary on the point and having no other evidence by which to establish it, has simply, suffered "a failure of proof of an essential fact." *Draper v. Louisville & N.R. Co.*, 348 Mo. 886, 899, 156 S.W.2d 626, 634 (1941). It is not his adversary's testimony by which he is "bound"; it is his own lack of contrary proof.

Implicit in the premise from which appellant's argument proceeds is the assumption that a party, by calling his adversary as a witness, makes a *judicial admission of his veracity* which precludes the calling party from disputing anything he says. As shown above, the rule is otherwise. With an appropriate adjustment of the premise, then it is only a short step to the conclusion that respondent, by putting Mrs. Brown on the stand, did not unconditionally and ineluctably "admit that she was in fact competent and not of unsound mind" and was no more precluded from proving the contrary by other witnesses than is a party from proving the untruth of what his adversary says in similar circumstances. And so, despite the novel and ingenious reasoning that has gone into the proposition, the distinction of being the first court in the world to adopt it must, for us, be an opportunity lost.

▮ 3rd: That "Instruction No. 3 was a proper statement of the law," nowise prejudicial to respondent.

That brings us to the serious point in the case. We quote the instruction, and, to focus attention on the criticized part of it, we set out that part in italics:

"Your verdict must be that Velma B. Brown is an incompetent person if you believe that at the time of these proceedings:

First, Velma B. Brown has such a mental illness which renders her[4] incapable of understanding and acting with discretion in the ordinary affairs of life, and

Second, *by reason of such mental illness there is a total deprivation of her understanding,* and

Third, that her powers of reasoning and comprehension have been so far destroyed or reduced by such mental illness that she is incapable of knowing and appreciating the nature and consequences of her acts in respect to her own conduct and the management of her property."[5]

---

3. Were the rule otherwise, the calling party would put himself at the mercy of his opponent, at ransom to the dirk of falsehood, a result no statute or rule of law was ever designed to invite.

4. Disregard the inelegant syntax; it is not "such as which" will affect our decision.

5. A bit of background is appropriate in fairness to the trial judge. There is no M.A.I. pattern for an instruction on this subject (an omission that every trial judge is familiar with in cases involving issues of more complexity, say, than automobile accidents). Confronted with that frustration, counsel for respondent made up one which closely parallels Instruction No. 3 except it omits all reference to the proposition submitted in the italicized portion of that instruction. Counsel for appellant were understandably insistent on a more restrictive standard of mental incompetency for the jury's guidance

For an orderly approach to the criticism leveled against the italicized portion of the instruction, it is necessary to refer back to the statute on this subject as it existed prior to 1955, § 458.010, RSMo 1949, since the cases relied on by appellant in defense of the instruction were all decided while that statute was in force. It read:

"For the purposes of this article, wherever the words 'person of unsound mind' or 'insane person' occur therein, said words shall be construed to mean either an idiot, or a lunatic, or a person of unsound mind and incapable of managing his own affairs, as the case may be, upon proof as aforesaid."

It will be seen that statute equated persons of unsound mind with insane persons by applying the same alternative definitions to each; hence, conversely for illustration, for a person to be adjudged "of unsound mind and incapable of managing his own affairs," the degree of his derangement must be shown to be such as would cause him to be classified as an insane person. In the first case on the subject, *Harrelson v. Flournoy,* 229 Mo.App. 582, 589–90, 78 S.W.2d 895, 899 (1934), the court took that view, saying that "unless they [weak minds] betray *a total lack of understanding* or idiocy or delusion, they cannot properly be considered unsound." (Emphasis ours). That case, at the same local citation, explains the philosophy of the law in the light of the statute that suggested it by saying, "To establish any standard of intellect or information, beyond the possession of reason *in its lowest degree,* as in itself essential for legal capacity, would create endless uncertainty, difficulty, and litigation, would

shake the security of property, and wrest from the aged and infirm that authority over their earnings and savings which is often their best security against injury and neglect." (Emphasis ours).[6] The next case, *In re Bearden,* 86 S.W.2d 585, 594 (Mo.App. 1935), parroted that language and gave additional emphasis to the phrase, "total lack of understanding". And the third case, *In re Delany,* 226 S.W.2d 366, 373 (Mo.App. 1950), affirmed the view of the other two that a total deprivation of understanding was a prerequisite to an adjudication of unsoundness of mind. Under the old statute, then, in the light of decisions construing it, appellant would undoubtedly be on sound ground in insisting that the inclusion of that concept in the given instruction was proper.

But the old statute was repealed in 1955 and a new one enacted, § 475.010, RSMo 1969, V.A.M.S., which reads:

"When used in sections 475.010 to 475.370, unless otherwise apparent from the context: * * * (3) An 'incompetent' is any person who is incapable by reason of insanity, mental illness, imbecility, idiocy, senility, habitual drunkenness, excessive use of drugs, or other incapacity, of either managing his property or caring for himself or both."

Did the new statute change the law? We say it did, for these reasons:

Of arresting significance is the fact that nowhere does the new statute use the term "insane person," or "person of unsound mind" as a synonym for it. Since those terms, as interpreted by the courts in the cases cited above, were of controlling im-

---

and, by dint of the cases discussed later in the body of this opinion and in the absence of other authority, persuaded the court, in the heat and haste of the emergency, to add the italicized part and give the instruction, as so amended, as the court's own instruction. These things happen in these circumstances with distressing frequency, and it would be ungracious of us not to acknowl-

edge our sympathy with the trial judge in the exigency that confronted him.

6. Lawyers of mature experience will realize that a certain amount of flatulent rhetoric has gone into that pronouncement, and a good deal of empirical knowledge has been neglected by it.

portance in fixing the law's standard of mental incapacity under the old statute, there must have been some reason for their omission from the new one. And we think Judge Ruark put his finger on it when he said that we live in a time of "changing concepts in respect to mental illness" and "[o]ur legislature has recognized this by the use of the word 'incompetent' in the statute, and by the definition of an incompetent as encompassing various mental disabilities, *including* that of 'insanity.'" *State v. England*, 328 S.W.2d 732, 736 (Mo.App.1959) (Emphasis his).

We have only to consult the legislative history of the Act (which we are authorized to do, *St. Louis Southwestern Ry. Co. v. Loeb*, 318 S.W.2d 246, 252 (Mo. banc 1958)) to confirm that view. In the committee comment, appended beneath the text of the statute in 26A V.A.M.S. at 6, we read:

"The definition of 'incompetent' as here given is designed to make possible the use of that term instead of 'insane person' and to cover all persons of unsound mind, *whether insane or not.*" (Emphasis ours).

Clearly it was the purpose of the legislature, in enacting the new statute, to fix a more flexible standard of mental incapacity and to relegate to past history any concept of incompetency which is circumscribed by the requirements of the earlier cases, and particularly that most stringent one, that to be adjudged mentally incompetent one must be shown to have suffered "a total deprivation of understanding."[7] The trial judge was right in concluding that inclusion of that standard in Instruction No. 3 was prejudicial error to respondent and in granting a new trial for that reason.

The order is affirmed and the cause remanded.

All concur.

FLANIGAN, J., took no part in the consideration or determination of this cause.

*On Motions for Rehearing or to Transfer*

PER CURIAM.

On motions for rehearing or to transfer, counsel for appellant have favored us with an erudite treatise in support of a proposition put forward by these steps: (1) that at common law the term "unsound mind" imported "not weakness of understanding, but a total deprivation of sense" [per Lord Hardwicke in *Ex parte Bransley,* 3 Atk.R. 168, 173, 26 Eng.Rep. 899, 901 (1744)]; (2) that the common law in this respect was not abrogated by § 475.010, supra, but was carried forward by it and is implicit in it; (3) hence, that we are in error in holding that the cited statute contemplates "a more flexible standard of mental incapacity" or anywise relaxes the requirement embodied in the italicized portion of the criticized instruction.

At the outset, we may observe parenthetically that there, is some question as to whether Lord Hardwicke's definition of unsoundness of mind *in 1744* can be said to have been within the contemplation of § 1.010, RSMo 1969, V.A.M.S., and its earlier enactments which incorporated into the jurisprudence of this state the common law as it stood *137 years earlier, to wit, in 1607,* which was "the fourth year of the reign of James the First"; and if Lord Hardwicke's definition was not so incorporated into our jurisprudence, then of course there is an

---

7. If "a total lack of understanding" is not the hallmark of slavering idiocy, it is, by popular comprehension, the next thing to it. Even an unweaned infant has *some* degree of understanding! What court can be expected to say, in the light of the new statute, that "an 'incompetent' is any person who is incapable * * * of either managing his property or caring for himself" *only* when his mental capacity is shown to be less than that of a diapered child?

obvious and fatal flaw in the premise from which appellant's proposition proceeds. But that question we leave to scholars and historians with the time and bent to pursue it.

*Assuming* that at common law the criticized requirement of the instruction would have been approved, we advance to the second part of appellant's proposition, viz., that inasmuch as § 475.010, supra, did not purport *in terms* to abrogate the common law in this respect, we ought not hold that it did so by implication. Cited in support is this statement from *State v. Kollenborn*, 304 S.W.2d 855, 862(10) (Mo. banc 1957), "The law does not favor repeals of the common law by implication in a statute, and a legislative intent to do so is generally not presumed"; and numerous references to *State v. Dalton*, 134 Mo.App. 517, 114 S.W. 1132, 1135 (1908), where Judge Nortoni set out the "three ways in which the common law on a given subject may be repealed." Not quoted to us, however, is the second of those ways, viz., "by such repugnance in the two laws [i. e., between the common law and the current statute] as evinces that they may not both operate as a rule of decision at the same time."

In the light of that rule, our answer to this part of appellant's proposition must simply be this: If there is anyone who can read § 475.010, supra, and rationally interpret it as requiring that the alleged "incompetent," to be adjudged such, must have suffered "a total deprivation of her understanding," as the instruction puts it—if there is anyone who can avoid the conclusion that the tenor of the statute · is so repugnant to Lord Hardwicke's definition "that they may not both operate as a rule of decision at the same time"—we confess that we are not attuned to the nice nuances of such reasoning.

Attached to appellant's memorandum as exhibits are monographs and committee reports submitted to the American Bar Association and the Sixty-eighth General Assembly in support of the adoption of a proposed Model Probate Code. We have examined those documents in tedious detail, "and still the wonder grows" as to why the patience of the court should be taxed with the task. Nowhere in them is there any statement to indicate, even by remotest implication, that the provisions of the Code relating to "incompetents" were intended to apply only to persons who had suffered "a total deprivation of understanding." Nowhere was such a notion suggested, nowhere entertained, nowise countenanced—possibly because the proponents of the Act realized that it would be repugnant to the sense and interests of society in the light of our "changing concepts in respect to mental illness." *State v. England,* supra, 328 S.W.2d at 736.

Finally, counsel for appellant say, "The court's holding . . . has thrown all the probate, circuit and appellate courts, the parties to this appeal and the trial judge to whom the case has been remanded for trial, and all other future litigants and attorneys involved in incompetency proceedings into total CHAOS." And in line with that pronouncement they add, "[w]e demand . . . that this court declare what standards should be followed for the determination of an incompetent person." The rhetoric, we think, is a bit overblown; counsel are unduly apprehensive. There is no need to conduct law school on this subject: "Sufficient unto the day is the evil thereof." · Matthew 6:34.

Secure in conscience and reason on these several points, we overrule appellant's motions.

All concur.