ANDREW KUNKEL v. THE CITY OF ST. LOUIS, a Municipal Corporation, Appellant.—163 S. W. (2d) 1014.

Division One, July 28, 1942.

1122

*Joseph F. Holland, George L. Stemmler, Joseph B. Haring* and *Orville W. Richardson* for appellant.

1124

*Douglas H. Jones, Arthur L. Wackwitz* and *Clark Hudson* for respondent.

GANTT, J.—Action for personal injuries. Plaintiff seeks damages in the sum of $25,000. He alleged a defective condition of a sidewalk in the city, which caused him to fall, resulting in the injury. At the close of plaintiff's case, the court directed a verdict for the defendant. It did so on the theory that there was no substantial evidence tending to show such physical or mental incapacity of plaintiff as would legally excuse his failure to give defendant the ninety day written notice of a claim against the city for damages, as required by Sec. 7636, R. S. 1939. The plaintiff filed a motion for a new trial. The court sustained the motion, and defendant appealed.

On review, the only question presented is whether or not the court correctly ruled the demurrer. We have ruled that physical or mental incapacity excuses a failure to give the notice, or cause the same to be given, and that the giving of the notice within a reasonable time, not exceeding ninety days, after the removal of the incapacity, is a compliance with the statute. [Randolph v. City of Springfield, 302 Mo. 33, 257 S. W. 449; Randolph v. City of Springfield (Mo. App.), 275 S. W. 567; Cole v. City of St. Joseph, 50 S. W. (2d) 623; Koontz v. City of St. Louis, 230 Mo. App. 128, 89 S. W. (2d) 586, 590.]

Defendant contends that there was no substantial evidence tending to show incapacity within the meaning of Sec. 7636, R. S. 1939, as construed by this court. There was evidence as follows:

On February 1, 1940, plaintiff, sixty years of age, slipped and fell on a sidewalk in the City of St. Louis, which resulted in a fracture of his right hip. He was a steel worker until 1930. Thereafter he worked as a common laborer until in 1933 he suffered a fracture of the left hip, which shortened his left leg two inches. As a result he used a cane. He then farmed for a while and two years before February 1, 1940, worked as a shoe shiner in Tony Lavitcha's barber shop, one block north of where he lived.

At the time he slipped and fell on the sidewalk, he did not lose consciousness. He remembered that he was carried across the street to his upstairs home and laid on the bed. The next day, February 2, 1940, his wife called a doctor who stated that plaintiff's right hip was broken and directed that he be taken to the city hospital. He was taken to the city hospital in an ambulance accompanied by four policemen. At that time he was a "poorly nourished, poorly developed man, appearing emaciated and dehydrated." The first five weeks plaintiff was in the hospital his right leg was in a splint and elevated in an effort to prevent a shortening of the leg. The effort failed, and his leg was put in a cast extending from his armpit to his heel. The leg was encased for eight or nine weeks and until May 13, 1940, when the cast was removed. During the time his leg was in the cast and for a number of weeks thereafter, he suffered pain from numerous sores on his leg, foot and back. From the time he entered the hospital he was given codeine (an opiate narcotic) in conjunction with aspirin and

luminal (both sedatives for pain) with increasing frequency until the removal of the cast. The hospital record shows that he was so treated as follows: February—12 times; March—28 times; April—26 times; May—14 times; June—1 time. The record further shows that he developed bowel trouble, for which he was treated during the months of February, March, April and May. The record further shows that the cast was cut in several places from time to time to relieve the pain and suffering of the plaintiff. The record further shows that during the time the leg was in the cast plaintiff had difficulty in sleeping, and from time to time complained ''bitterly of the pain.''

On June 11, 1940, plaintiff signed out of the hospital and was taken home by his wife and a friend. For two weeks before leaving the ·hospital· he used a wheel chair. He was dissatisfied at the hospital and left the same against the advice of his wife and the hospital physician. During his confinement in the hospital and in February, 1940, his stepson died at the hospital. At that time his wife was without funds, sick and in trouble. She had enough insurance to bury her son. Usually she visited plaintiff at the hospital once a week but sometimes not oftener than once in two weeks. On the death of the son she did not visit him for three weeks. Very few visited plaintiff. Tony Lavitcha, the barber, visited him once for a few minutes. At no time was plaintiff unconscious while in the hospital or during the time he was confined to his home as a result of the injury. He was in bed at home for three weeks after he returned from the hospital.

Plaintiff's wife testified as follows: ''I visited plaintiff at the hospital sometimes twice a week—sometimes once a week—sometimes only every couple weeks; that he was in a bad condition—would not remember her previous visit; I guess he didn't know anybody to know; he didn't talk very much and didn't have much to say; didn't say really anything to me; that she had only an hour to make visit; that patients (her son and husband) were in separate divisions of hospital, and that she spent most of her time with her son.'' Witness explained ''bad condition'' by stating that ''he didn't want to talk, and his exclamation 'Oh, I am in such pain;' that she did not want him to come home; that he insisted on coming home; that she had seen her husband at hospital not over fifteen times during his stay there; that after he came home she doctored him herself that she was not well herself, all crippled up; sometimes, when visiting son, she would not visit husband; that lawyer was contacted July 12, 1940.'' Defendant was served with notice of the claim on July 17, 1940.

Dr. Snyder, a witness, interpreted a series of X-rays, a part of the City Hospital record, and testified that he had examined plaintiff and made an X-ray which showed ''there is no firm union, there is some fibrous union, but no callous formation present.'' Describing the normal hip joint, he stated that ''ligaments are leathery attachments —directly attached to .the bones—they crisscross every conceivable

direction—that fractures of the hip occur more readily in the aged than in younger persons—that he had examined plaintiff's fracture—that it would be accompanied by shock—that pain would be more intense at fracture site—such a fracture would affect the sciatic nerve, beginning in lower part of back and transversing the lower limb posteriorily. There are numerous nerves in and around the hip joint—they would all be affected by the unusual torsion or pull.''

He further testified that ''there would be permanent damage to the soft tissues—pain would be constant at all times during the healing process—going sometimes as much as three months—his fracture was nonimpacted—an impacted fracture would heal faster—because the bones are already together—such fracture would cause loss of sleep; that in treatment of such a fracture he would first of all try a sedative medicine—a sedative calms the patient, quiets the nerves; luminal and aspirin are sedatives—aspirin has analgic purposes, diminishes pain—codeine is a narcotic—absolutely deadens pain; his fracture was of an unusual type, in the vast majority of cases you do not get this result; that he examined plaintiff Nov. 6, 1940; that there isn't a healing and there wasn't up to the time I examined him.''

The doctor further testified that such a fracture, the pain suffered incident thereto, with particular reference to a man's mind, ''would produce such misery and anguish of mind,'' the individual would be in ''agony'' and ''preclude any possibility of thinking clearly, intelligently and rationally.''

We think the above stated evidence made a submissible case for the jury on the issue of physical or mental incapacity and on the question of whether or not plaintiff served the statutory notice within a reasonable time after the disappearance of the incapacity.

Defendant cites cases of other jurisdictions as follows: City of Hastings v. Foxworthy, 63 N. W. 955; Saunders v. City of Boston, 46 N. E. 98; Townsend v. City of Boston, 122 N. E. 395; Ehrhardt v. City of Seattle, 82 Pac. 296; May v. City of Boston, 23 N. E. 220; Ray v. St. Paul, 46 N. W. 675; Egan v. Township of Saltfleet, 29 Ont. L. Rep. 116; Goodwin v. Fall River, 117 N. E. 796; Hall v. City of Spokane, 140 Pac. 348; O'Connor v. City of Hamilton, 10 Ont. L. Rep. 529. Those cases may be distinguished on the facts.

The judgment sustaining the motion for a new trial should be affirmed. It is so ordered. All concur.