Mary GELHOT, Respondent,

v.

CITY OF EXCELSIOR SPRINGS, MISSOURI, Appellant.

No. 22171.

Kansas City Court of Appeals.

Missouri.

March 7, 1955.

Dudley D. Thomas, Carrollton, Robert E. Coleberd, Liberty, Lawson, Hale & Coleberd, Liberty, of Counsel, for appellant.

DEW, Judge.

Plaintiff instituted this suit in Clay County, Missouri to recover damages for personal injuries alleged to have been sustained in a fall upon premises owned and operated by the defendant. On change of venue the cause was transferred to. the Circuit Court of Carroll County. Plaintiff recovered a verdict and judgment for $2,000. Defendant has appealed.

The petition, among other things, alleged that defendant, a municipal corporation, owned and operated a certain mineral water system health resort in such city, and that while a patron of the same plaintiff was injured on a pathway alongside of some broken and dirty steps situated on those premises, when the ground gave way and caused her to fall and break her leg and injure her thigh.

The answer challenged the sufficiency of the petition; admitted the defendant was a municipal corporation, generally denied all other allegations of the petition; pleaded contributory negligence, and averred that plaintiff did not give the defendant

notice of her alleged fall and injuries as required by Section 77.600 RSMo 1949, V.A.M.S.

According to the plaintiff's evidence the defendant was, at the time of the alleged accident, an incorporated city, operating under the city manager form of government. Sections 78.430–78.640 RSMo 1949, V.A.M.S. The city had a population of 5,888. It operated within its limits a mineral waters system as a part of the city's activities; that system was managed by a committee appointed for that purpose under an ordinance duly passed. In 1934, defendant mortgaged the system to the Federal Emergency Administration of Public Works, which mortgage was in the process of foreclosure at the time of plaintiff's accident. The building wherein the mineral waters are dispensed is called the Hall of Waters, and the grounds, park and premises adjacent to the building are called the Hall of Waters Park. In the park are several paths or walks leading to and from the building and the bandstand, levee, and various parts of the park, and some steps at different points in such pathways or walkways.

The plaintiff, 57 years of age and a resident of St. Louis, Missouri, testified that in May, 1950, as she had done several times before, she went to Excelsior Springs to partake of the mineral waters and to take the mineral baths available there. She was accompanied by her son. On the morning of May 13, it began to rain. After breakfast she went to the Hall of Waters, drank some saline water and left that building to walk along one of the walkways in the park. This walkway was concrete and its surface was broken. She stepped to the side of it and proceeded along a dirt pathway. A few feet before she reached some steps she noticed the concrete walk was broken and partly covered with dead leaves, twigs and some dirt which had been washed down upon it. Arriving at the point where there were three or four steps on some of which there was some dirt, the plaintiff stepped to a bare spot in a well beaten pathway alongside of the steps and proceeded to walk down. She testified:

"A. Well, there was dirt there, and the dirt sloped down, well, from the southwest east. I can't describe it. It was just on an angle. * * *

"Q. Had you ever seen any people using the pathway? A. I did.

"Q. And that pathway was where, in relationship to the steps? A. Alongside of it. * * *

"Q. Please tell the court and jury what transpired at the time that you started down the pathway that was to the south of the steps—* * * A. I got off of this concrete walk where it was broke and walked over to the dirt part, and it was worn already.

"Q. It was what? A. It was a worn path already.

"Q. All right. A. And I walked down that path, and as I say, it's about maybe, well, the height of three or four steps up, it could be a fifth step there, I wouldn't say, and it sloped down from that step on both ways, and when I got down there about, I'll say maybe the top of the second step, I don't think it was any higher than that, this foot went just down in the mud and soft earth, it was just soft earth, and it went away and I couldn't stop, and when I went down with this on that—this leg went under me, and I was sitting on that.

"Q. Which foot went out from under you? A. My right one.

"Q. And then what happened to your left foot? A. Well, it was under me.

"Q. What do you mean by under you? A. Well, I was sitting on it. * * *

"Q. Now, did the ground give way or did you stumble or what caused you to fall? A. All I can say, it was the damp ground because you could see

my heel mark where the ground all came down".

She testified that on the day before the trial she visited the place and walked down the steps.

Plaintiff testified further that after her fall she was unable to put her weight on her injured leg and with the aid of a piece of a limb of a tree she went to a nearby bench and sat there until later helped away by her son. She visited a doctor that evening, who bandaged her knee, gave her some medication and advised x-rays. The next day she returned to St. Louis, consulted her family doctor and had x-rays taken in that city, which revealed a fracture of the proximal end of the left tibia, extending into the joint but with no displacement of fragments. Her knee swelled and caused much pain.

Plaintiff testified that after her accident she was taken to her son's home and there confined in bed for four weeks. A cast had been placed on her left leg and that leg had to be sustained at an angle upward; that after that period she was allowed to sit in a wheel chair with her leg propped up. During all of this time her son and daughters waited on her completely. Another cast was placed on her leg, which was not removed until some time in September or October. In the meantime, she was allowed to sit in her wheel chair. As soon as the furniture was rearranged to permit her to move about the room in the chair, she wrote a letter to the defendant's city manager.

The plaintiff had been conducting a small business of lining furs, and also some general seamstress work. During her confinement after the injury she was able to do some of this work while in her wheel chair. After her accident she tried to return to her work of relining furs, but she was unable to do it because it required use of two legs to kneel on the floor and take measurements and to operate the fur machine, whereupon she obtained a job at a cleaning establishment and made $1,210.34 in 1953.

On August 28, 1950, the plaintiff wrote a letter to the defendant's city manager, inquiring as to whom she might contact regarding an accident she had at Excelsior Springs. On September 2, 1950, the city manager wrote her, suggesting that she contact defendant's city attorney, giving his name and address. On September 9, 1950, plaintiff wrote the named city attorney as follows: "Dear Sir: The manager of the Hall of Waters, Mr. Hugh Smith, gave me your name. I slipped in rear of the Hall of Waters and broke my left leg. The doctor there wanted me to wait a couple of days to get an x-ray but after twenty-four hours of pain I could not stand it. So I came to St. Louis. X-rays show it is broke at the knee. I had a cast on from toe—from toe—'what is that word?' * * * up for ten and a half weeks and a wheel chair and crutches. In my work I need the use of both legs and this happened four months ago. I am one that is on feet all the time. This is very hard—this is very hard. You cannot know what it means to be laid up with a broken limb until you have one yourself not to say anything about the pain. This has been very expensive to me, not only the loss of work but the cost of having someone to wait on me, clean house and laundry my clothes. This does not include my doctor or hospital bills. Perhaps we can come to some agreement—we can come to some reciprocal agreement without future complications. Yours very truly, Mary Gelhot, 4134 Peck Street, St. Louis 7, Missouri." She received no reply to the above letter, but a statement was thereafter obtained from her.

At the close of plaintiff's evidence the defendant offered no evidence on its part, but moved for a directed verdict in defendant's favor, which was overruled by the court.

The defendant's first point is that the court erred in refusing its motion for a directed verdict on several grounds. The first ground is that plaintiff failed to comply with Section 77.600 RSMo 1949, V.A. M.S., requiring notice to the defendant of her alleged accident and injuries claimed.

It is pointed out by the defendant that the alleged accident was on May 13, 1950, and that her first letter to the defendant regarding the same was dated August 28, 1950, and that her letter setting forth the information required by the statute, was not sent until September 9, 1950. It is contended that these letters did not constitute the notice required by the above statute to be sent within 90 days after the accident. Section 77.600 provides that no action shall be maintained against any city "organized" in this state as a city of the third class, on account of injuries growing out of any defect or unsafe condition of any bridge, boulevard, street, sidewalk or thoroughfare in said city, until a notice shall have been given to the Mayor of said city within 90 days after the date of the accident for which the damage is claimed, containing the information as to the place where, and time when, the injury was received, and the character and circumstances of the injury, and that claim will be made against such city therefor. It is argued that by adopting the city manager form of government, defendant had to be a city of the third class, or a city operating under a special charter entitling it to become such. Authorities are cited by the defendant to show that failure to give such notice is fatal to plaintiff's case. Brown v. City of Kirksville, Mo.App., 294 S.W. 436; Cole v. City of St. Joseph, Mo., 50 S.W.2d 623–624, 82 A.L.R. 742.

The plaintiff takes the position that there is no proof that defendant was "organized" as a city of the third class; that although its population is such as required for a city to become a city of the third class, it is not shown to have elected to do so. Section 72.030 RSMo 1949, V.A.M.S., is as follows: "All cities and towns in this state containing three thousand and less than thirty thousand inhabitants, which shall elect to be a city of the third class, shall be cities of the third class." Plaintiff further asserts that it is not shown that defendant was a city operating under a special charter, Section 81.010; that the fact that the defendant adopted the city manager form of government does not change defendant's classification, see State ex rel. Thompson v. Roberts, Mo.App., 269 S.W.2d 148; that it is true that Section 78.440 continues in effect previous laws of a city after its adoption of the city manager form of government when not inconsistent, which previous laws, if applicable, would include the requirement under Section 77.600 that notice of suit be given to cities "organized" as cities of the third class, and would include the requirement under Section 81.060, of such notice of suit against cities operating under a special charter with a population between 500 and 3,000, but that such sections do not apply to defendant in this case; that the statutory provisions for city manager form of government for cities of the third class, Sections 78.430 to 78.460, do not require such notice; nor does Chapter 71 of the statutes, pertaining to all cities and towns, require any such notice.

Furthermore, plaintiff also contends that Section 77.600, relating to the adoption of the city manager form of government by cities of the third class and special charter cities continues in effect only laws "governing" such cities before such adoption, whereas the notice requirement only "relates" to a municipality and does not "govern" it. Plaintiff further insists that even if the statutory notice were otherwise required of the plaintiff in this case, the failure to give such notice through physical inability to do so on account of the very injuries complained of, was not fatal inasmuch as she did so within a reasonable time after she became able to do so, citing Randolph v. City of Springfield, 302 Mo. 33, 257 S.W. 449, 31 A.L.R. 612. She also cites Kunkel v. City of St. Louis, 349 Mo. 1121, 1128, 163 S.W.2d 1014, wherein the court said: "Physical or mental incapacity excuses a failure to give written notice to municipality of injury within 90 days as required by statute, and the giving of the notice within a reasonable time, not exceeding the 90 days, after removal of the incapacity, is a compliance with the statute".

The plaintiff had a right of action against the defendant at common law

as soon as she sustained her injuries, provided that she established negligence on defendant's part. Any provision of statute designed to limit or modify such right of action is in derogation of the common law and common right " 'and should be construed accordingly' ". Randolph v. City of Springfield, supra [302 Mo. 33, 257 S.W. 452]. In the absence of proof that defendant had been "organized" as a city of the third class, Section 77.600 cannot be applied to it in this case under the record, and we must hold that notice of the present action ninety days prior to its institution, was not shown to be required. It would serve no further purpose to determine whether or not the notice served by the plaintiff subsequent to such ninety day period was, under the circumstances, a substantial compliance with a notice requirement.

■ Defendant's next ground assigned for error in the overruling of its motion for a directed verdict is that there was no evidence to prove that defendant had ever established or maintained the path in question as a walk. Plaintiff has not supplied any brief on this or any other point raised except the matter of notice above discussed. Defendant urges that there is nothing in the evidence to show that defendant, by its acts or conduct, directed the public to use the path in question or had warned the public not to use the steps. There was evidence of the existence of a well worn path and that it was used by persons going from the Hall of Waters to other parts of the park surrounding it, and that the steps alongside of which the path was located were partly covered with dirt. We deem the evidence sufficient to submit to the jury the existence of the path, its location and use, and the condition of the steps nearby.

■ The second ground on which the defendant claims the court erred in overruling its motion for a directed verdict, is that there is no evidence to show that the defendant had notice of the defective condition of the path or that such condition had existed long enough to imply notice to

defendant. The testimony of the caretaker and of the plaintiff, if believed by the jury, was sufficient to carry a reasonable implication that the path was not of recent creation, but by its very nature a condition that would develop through use over the lapse of time sufficient for the defendant, in immediate possession, management and control to have had notice of the same.

■ The third ground on which the defendant claims the court erred in overruling its motion for a directed verdict is that the plaintiff's evidence does not show that the property was owned by the defendant or by the R. F. C., a Federal Government agency. The evidence referred to was that in 1934, the defendant mortgaged its mineral water system to the R. F. C., and that that mortgage was in the process of foreclosure. Such evidence would not be sufficient to overcome the other evidence heretofore noted of the ownership of the area in question by the defendant, since the mere pendency of the foreclosure of a mortgage would not in itself show divesting of the title of the defendant to the property in question.

■ Defendant next contends that the court erred in overruling its motion for a directed verdict because the evidence shows that the plaintiff was guilty of contributory negligence as a matter of law. We think it is a matter for the jury to determine whether the plaintiff was contributorily negligent in following the path around and alongside of the steps in question under the conditions shown, including the condition of the steps provided by the defendant, as described by the witness.

We find no error on the part of the court in overruling the defendant's motion for a directed verdict.

■ Defendant next complains of plaintiff's Instruction 3 because it submitted to the jury in considering her damages, the element of her loss of earnings, impairment of her earning capacity and sums which she was reasonably certain to ex-

pend in the future because of her injuries. The instruction read as follows:

"The Court instructs the jury that if you find the issues in favor of plaintiff, you will assess her damages at such sum as you find and believe from the evidence will compensate her for the injuries, if any, sustained by her as shown by the evidence; and in estimating such damages you will take into consideration the physical injury, if any, inflicted; the bodily pain, if any, and mental anguish, if any, which she has endured and suffered and which she is reasonably certain to endure and suffer in the future; the character and extent, her injuries, if any, and whether they are temporary or permanent; her loss of earnings, if any, and the impairment of her earning capacity, if any; the sums, if any, which she has expended for medical and hospital expenses by reason of such injury, if any, and the sums, if any, which she is reasonably certain to expend in the future by reason of her said injury, if any."

According to plaintiff's testimony she was not employed in 1949. However, in 1950, she did some work on furs at her home and made about $125 that year and returned materials not finished. In 1951, she did some fur work along with other sewing. In 1952, because of her injured limb, she was unable to resume her fur work because she could not kneel to make measurements, nor could she operate her machine, which required both legs and feet for the pedals. She worked about two weeks that year. In 1953, she took a job at a cleaning establishment and during that year made $1,210.34. Prior to 1945, she had worked steadily in the fur repair business and made $50 a week during the season from September to December 15. In her present job she stands sometimes for a half hour at a time and then sits for about three hours at a time, because when standing her foot gets numb and a soreness still exists in the joint where the break was. She testified that in her own fur business she would make $60 a week during the busy season and was making $28 at the present time; that to make as much as she made in her own business she had to work a whole year. We think there was substantial evidence of her loss of earnings and of her earning capacity to submit those issues to the jury.

The plaintiff's physician testified that he believed that her limp, which was noticeable, was now probably a matter of habit and that she will probably always limp to some degree. He did say, however, that judging from the present condition of plaintiff's leg he believed that it may in the future buckle, the anterior thigh muscle being weak. He said sometimes the muscle fails to hold the leg extended and that such result is a reasonable occurrence to be expected in plaintiff's condition. We cannot say that there was no substantial evidence that some medical expense may be necessary in the future.

As to the amount of future medical expenses, if any, there was, of course, no definite proof offered nor, by its very nature, could such evidence be available. In Sotebier v. St. Louis Transit Co., 203 Mo. 702, at pages 716–717, 102 S.W. 651, at page 654, the court said: "The third objection lodged against this instruction is that it permits the jury to include in its verdict expenditures which might be necessary for plaintiff to incur in the future, on account of her injuries, when there was no evidence to show that they would be necessary, or what they would be reasonably worth. We are also of the opinion that this objection is without merit, because at the trial the evidence showed that plaintiff had three physicians and one or two of them testified that she was then still under their charge and was a helpless, a suffering paralytic, and would never improve, but would continually grow worse. * * * As to what attention she will require during her life and its probable value are matters of more or less speculation. No one can tell how long she will live, what her suffering will be or what amount of medical attention she will require. The jurors are as capable of judging of those matters as any one else could be * * *. And what

we have said regarding the last objection is equally applicable to this one; but we will add that we are entirely unable to see how any witness could, with any degree of certainty, testify as to what *medical attention* she might require during the remainder of her life. No physician or expert can tell how long plaintiff will live, what her pain and suffering will be if any, what kind and how often she will need medical treatment, nor what such services would be reasonably worth in the future. The most the court can do in such cases is to call the attention of the jury to the injury, if permanent, and, if the evidence shows that the character of the injuries is such that the party will probably need medical attention in the future, then tell them that they may allow such sum therefor as the evidence and facts in the case show would be just and reasonable for such attention and services."

In Sang v. City of St. Louis, 262 Mo. 454, 171 S.W. 347, at page 350, the court said: "We know and the jury knew medical attention in the future would be reasonably certain to guard the situation, or to reduce the recurring hernia, or prevent strangulation. To the common sense then of the jury, guided by their conscience, their everyday experience, their sound judgment, their oaths, must be left the question; for there is no line of testimony by which the fact may be established to an absolute certainty. To leave it to the jury is the best the law can do, for no case calls for better testimony than the case admits of. (Citations.)

"The rule is that adequate compensation may be recovered in a single action for all the natural consequences of a negligent act. That principle controls here. Future expenses from physicians rest upon the same grounds as the probable loss of future earnings. Turner v. Boston & M. R. Co., 158 Mass. [261] loc. cit. 267, 33 N.E. 520.

"Moreover, if, in the state of the proof, defendant desired to limit the recovery for future medical services to a nominal amount, it should have tested out its right to do so by asking an instruction to that effect. (Citations.)"

We believe the jury in the instant case was authorized, under the evidence, if it found that plaintiff would reasonably require future medical services, to determine and allow a reasonable amount to compensate her therefor. Byars v. St. Louis Public Service Co., 334 Mo. 278, 295, 66 S.W. 2d 894; Petty v. Kansas City Public Service Co., 355 Mo. 824, 832, 198 S.W.2d 684. We find no prejudicial error in plaintiff's Instruction 3, as claimed under this point.

 Defendant's third and last point of error is as follows: "The court erred in giving plaintiff's Instruction No. 1 for the reason it omits essential facts necessary to be found by the jury to entitle plaintiff to a verdict". This does not specify any allegations of error as required by Supreme Court Rule 1.08, 42 V.A.M.S., and presents nothing for our review. Ambrose v. M. F. A. Co-op. Ass'n, Mo., 266 S.W.2d 647. Judgment affirmed. All concur.