Ira B. CRAWFORD, Appellant,

v.

CHICAGO–KANSAS CITY FREIGHT LINE, INC., a Corporation, Respondent.

No. 54241.

Supreme Court of Missouri, Division No. 2.

July 14, 1969.

Lyman Field, Rogers, Field & Gentry, Kansas City, for appellant.

Heilbron & Powell, by Richard H. Heilbron, Kansas City, for respondent.

PRITCHARD, Commissioner.

For personal injuries resulting from a rear-end collision, on April 18, 1962, of defendant's truck with plaintiff's car, which was stopped at a stoplight, the jury award-

ed plaintiff $40,000 on his claim, under Count I, of $100,000. Defendant's motion for new trial was sustained because of error in refusing to give two withdrawal instructions requested by defendant:

"Instruction No. 12

The issue of surgery on plaintiff Ira B. Crawford for an injured disc is withdrawn from the case and you are not to consider such issue in arriving at your verdict.

(M.A.I. No. 30.01—tendered by defendant)

"Instruction No. 13

The issue of a fusion or a stabilization operation on plaintiff Ira B. Crawford is withdrawn from the case and you are not to consider such issue in arriving at your verdict.

(M.A.I. No. 30.01—tendered by defendant)."

The third ground for the order of a new trial was: "The verdict of the jury is excessive in that it permits the inclusion of damages on the issue of surgery on plaintiff for an injured disc, and damages on the issue of a fusion or a stabilization operation on plaintiff."

There was a verdict under Count II for $750 for plaintiff's wife for her loss of consortium, which verdict was also set aside and a new trial also ordered. No issue is here presented as to Count II, and reference to "plaintiff" herein means the plaintiff, Ira B. Crawford.

The basic issue is whether there was a lack of substantial medical evidence that plaintiff, in order to be alleviated of his condition, would be required to undergo future disc surgery and fusion or stabilization surgery so as to justify the court's grant of a new trial for its initial refusal to give the above Instructions Nos. 12 and 13.

Shortly after the collision, which was of considerable impact, plaintiff's car having been knocked 75 feet or over, he drove back to his office in the BMA Building in Kansas City. There he became ill, was placed in an infirmary bed in the building, and was that afternoon driven to Research Hospital. There, in the emergency room, plaintiff was seen by Dr. Harry B. Overesch, whose qualifications were admitted by defendant as a "highly reputable and capable orthopedic surgeon." Dr. Overesch gave his opinion that when he first saw plaintiff he had "an acute traumatic cervical spine and lumbar spine sprain and strain * * * which would indicate injuries to the soft tissues, the muscles, the ligaments, the fascia, or the fibrous tissue, rather than the bone, at that time." It was apparent to the doctor that these injuries were in consequence of plaintiff having been hit by a truck that morning. As to the cervical spine, X-rays showed no evidence of fracture or dislocation, no narrowing of the interspaces, and no compression of the bodies of the vertebrae. There was, however, a report and X-ray showing of a limitation of flexion (the downward movement) of the cervical spine. Plaintiff testified that his neck area was swollen the next day so that he could not button the second button of his shirt, and Dr. Overesch's opinion was that such would indicate an injury of some initial severity in the neck. There was present, as shown by X-rays, some hypertrophic spurring in the neck vertebrae which was not of any significance in the production of plaintiff's present acute condition, but pre-existed the accident.

X-rays of the mid-back showed the dorsal spine to be in normal alignment, with no evidence of fracture or dislocation. Before the accident, plaintiff had no narrowing or reduction in size of his disc spaces (dorsal spine or low back). There was, on April 18, 1962, prescribed for plaintiff some codeine for pain, hot packs, massage, ultrasound and ultrasonic diathermy to the neck daily. On April 20, pelvic traction and flexion back exercises were added. These treatments were continued on an out-patient basis: 9 in April; 20 in May; and 12 in June. On April 28,

plaintiff had developed left leg pain, and had acute cervical and lumbar spine sprain and strain. The pain in his left leg, down the sciatic nerve, was related to the low back.

Dr. Overesch next saw plaintiff in his office on August 2, 1962, at which time he had severe muscle spasm and restriction of the cervical spine motion. There was also muscle spasm and tenderness in the low back with a limitation of motion, and was "real tender over the sciatic notch," and had numbness and tingling in the left leg.

Dr. Overesch saw plaintiff twice in September, and on November 13, 1962, his condition being essentially the same, but he having developed a "charley-horse" pain in the left calf, and on the latter date the left knee jerk was slightly diminished, the straight leg raising test was slightly positive, there was more extensive, increased, ligament calcification in the cervical spine and a slight narrowing of the interspace between the 6th and 7th vertebrae. During all of this time, Dr. Overesch was trying to treat plaintiff conservatively without surgery. He saw plaintiff on four occasions up to and including May 7, 1963, at which time, after consultation with neurosurgeon Coburn, it was decided that plaintiff should be hospitalized, which he was for fifteen days in June, 1963, and was given intensive physical therapy. That therapy caused considerable improvement at the time of dismissal from the hospital, but by November 7, 1963 plaintiff's symptoms had returned. There were additional difficulties of headaches, curtailment of activity, and there were positive signs appearing in both straight leg raising and Lasegue's signs were positive on the left, indicated by pain caused by nerve root compression at the area where it comes out the low back. At this time Dr. Overesch concluded that plaintiff "might" have to have spine stabilization in his neck region to alleviate pain.

On May 7, 1964, a little over two years after the collision, Dr. Overesch examined

plaintiff again. At that time the doctor observed that plaintiff was sweating profusely in his face, lips and axillary (armpit) region. Muscle spasm was still present in the cervical spine and leg raising signs were still positive. The ankle jerk was slightly decreased, and X-rays showed developing narrowing of the cervical and lumbar disc interspaces. The doctor then concluded that plaintiff had rather permanent disability in his neck and low back. He might require spinal stabilization in his neck region for relief of trauma and his symptoms. The doctor felt, too, that plaintiff had the intervertebral disc injury in his low back and lumbosacral region, which had improved somewhat over his previous examinations, but he was still not without the possibility that he might have to have it explored by a laminectomy (surgery) and possibly a fusion if he was unstable in the low back. A year later, May 10, 1965, Dr. Overesch felt that plaintiff's symptoms were definitely persisting, and he had nerve root compression in the neck spine and low back. The conditions were about the same on May 4, 1966, and the doctor felt plaintiff should be admitted to the hospital for myelography. This was done, with Dr. Coburn (a neurosurgeon) in consultation. The myelogram was negative, and Dr. Coburn's final diagnosis was "Sciatic neuralgia, left." According to Dr. Overesch there are periods of remission and exacerbations in the disorder of intervertebral disc injury, and that myelograms are known to be 20% false, "a lot of the bulging discs that are here today, better tomorrow, back again the next day, will fall in that 20 percent." At the time of the myelogram an exploratory laminectomy was not indicated.

Plaintiff's physical therapy was renewed, and Dr. Overesch saw him again on January 25, 1968, when he found crepitation and limitation of motion in the neck in all directions. There was also limitation of motion in the lumbosacral area, also in all directions. X-rays of the neck showed continuing narrowing of the disc interspace between the 6th and 7th vertebrae, and

there was narrowing of the disc spaces at two levels of the low back.

At the trial (which began June 24, 1968), Dr. Overesch felt that plaintiff was still getting nerve root irritation in the neck spine and in the low back. "[A]nd that whether this was due to a bulging disc or to instability, it's a little difficult to determine exactly, or whether it was both, or a combination of both. I felt that he might require decompression of the nerve roots if the pain persisted, and I would say particularly the left side. Q. When you say 'might' did you put that in terms that he would most likely require it? A. Yes. I would say he would most likely require it for relief. Q. Does that mean reasonable medical probability for attempted relief? A. Yes. Q. Is that an extensive surgical procedure that will require hospitalization? A. Yes, it would, and it is an extensive procedure." Dr. Overesch does not perform that type of operation, a neurosurgeon does, and the general surgical fee therefor would be between $350 and $400. For the two or three weeks required for surgery, workup and recovery, the hospital costs would be around $1,500 to $2,000. Plaintiff, to the trial date, had refused to accept surgery, and Dr. Overesch thought that a 100% assurance of cure could not be given, but felt that with modern-day surgery and good anesthetic techniques that plaintiff very definitely should get improvement. If plaintiff does not accept the surgery the conditions he has are permanent with reasonable medical certainty. It is possible that surgery might not improve plaintiff, and there is a surgical risk that he might end up worse.

On cross-examination it was elicited from Dr. Overesch that he had not testified or reported that plaintiff had a herniated intervertebral disc. There is more than one thing which can compress a nerve root: a disc; a tumor; a fracture of the body of a vertebrae; and deposits of bone around foramina. There are many degrees and kinds of disc injuries, some quite serious and some less so. In some cases there can be a remission of a disc injury with no further trouble. Some discs bulge and some actually rupture and herniate. At the time plaintiff had the myelogram he was not having a remission or he would not have had it done. Even if Dr. Overesch would recommend surgery he would want another myelogram as being consistent with good medical practice in this case. "Q. Now, you mentioned a few minutes ago something about surgery. You are not telling this jury, as I understand it, that you recommend this man go to surgery and have a disc removed in his back, in the present state of your knowledge about his condition, are you? A. I would say that if his symptoms persist like they have, and he feels that he cannot tolerate the pain or cope with it, that I feel under the circumstances, with the failure of the conservative treatment to relieve him, that that is his only other alternative to getting over this thing, or at least treating it, and that he would probably have to have an exploratory laminectomy. Q. And is there any way to tell what you would find or what the surgeon would find at the time of that exploratory laminectomy? A. No, I think it would be hard to say. I think you would have to look at both levels, both the fourth and fifth lumbar interspace. Q. That would be speculative at this time, wouldn't it, Doctor? A. Well, I think his clinical findings fit into one or the other levels." Dr. Overesch testified that if the back was unstable he would want to fuse, but if it were not unstable the chances are he would not, but there is a difference of opinion. "Q. All right. And if this man —if you ran another myelogram, or Dr. Coburn did, and if the myelogram were positive, and if Mr. Crawford elected to have surgery, and if they did operate on him, and if they found a disc, you still can't tell now whether they would need to do a fusion, can you? A. It wouldn't be a hundred percent sure, but I would expect it would be more likely, because I

would doubt whether he would have normal ligamentous structures now, or I doubt whether he would have normal stability after this length of time, with these symptoms and with what has gone on in the past." As far as plaintiff being a good candidate for surgery, he is a stable person emotionally, should have his blood pressure watched, but otherwise he does not seem to have any other impairments.

On redirect examination Dr. Overesch thought that all plaintiff's complaints and the conditions he treated and examined him for were attributable to the auto accident of April 18, 1962. "Q. * * * In your opinion is the condition in his back attributable to a disc injury that you believe came in consequence of this accident? A. I think it could be the ligamentous-muscular injury along with it. Q. Attributable to the accident? A. Yes."

It is not necessary to elaborate upon plaintiff's testimony. Suffice it to say that since the accident he has never had a pain-free day or night; since the summer of 1963 he has slept on the floor with his buttocks against a divan and his feet on top of it. He has refused to undergo an operation on his back.

Defendant, in its brief, "admits that the record establishes that plaintiff sustained injury and that there was a causal connection between the accident and the injury." Plaintiff's damage instruction (MAI 4.01) told the jury that if it found for him, "then you must award him such sum as you believe will fairly and justly compensate him for any damages you believe he sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in evidence." Defendant's position is, "that the jury was permitted, under the instructions given, to consider the effect on plaintiff of types of surgery which were not established by competent evidence and to base an award of damages thereupon." It is true that Dr. Overesch did not testify or report that plaintiff had a *herniated* disc. But he did positively testify that plaintiff had an injured

disc, with nerve root irritation in the neck spine and in the low back, and that these conditions were caused by the collision. That opinion was given as early as May, 1964, when he felt that plaintiff had the interevertebral disc injury in his low back and lumbosacral region. A year later plaintiff's symptoms were still persisting and the doctor felt that he had nerve root compression in the neck spine and low back. The conditions were about the same in May, 1966, when plaintiff had the myelogram, which showed negative. Under all of the evidence, it is not conclusive upon or destructive of the doctor's testimony of his opinions that the myelogram was negative in May, 1966, and surgery was not then indicated in view of his further testimony as to the accuracy of myelographic tests, the persistence of plaintiff's symptoms, and even though plaintiff may not have had a period of remission when the test was given. All of the same were questions for the jury.

The final opinion of Dr. Overesch was given at the trial. He then felt that plaintiff was getting nerve root irritation in the neck spine and low back, and, as stated by him on several occasions during his previous testimony and reports, he felt that plaintiff *might* require decompression of the nerve roots if the pain persisted, particularly the left side. But on this occasion the prognosis was developed: "Q. When you say 'might' did you put that in terms that he would most likely require it? A. Yes. I would say he would most likely require it for relief. Q. Does that mean reasonable medical probability for attempted relief? A. Yes. Q. Is that an extensive surgical procedure that will require hospitalization? A. Yes, it would, and it is an extensive procedure." Then on cross-examination the matter of future surgery was further developed when Dr. Overesch felt that plaintiff would probably have to have an exploratory laminectomy if he could not tolerate or cope with the pain, and with the failure of conservative treatment. As to the speculative nature of what would be found on an exploratory

laminectomy, Dr. Overesch thought that one would have to look at both levels (of the lumbar spine) and that plaintiff's clinical findings fit into one or the other level. As to the need for fusion of the spine, although not "a hundred percent sure," Dr. Overesch expected that it would be more likely because he doubted that plaintiff would have normal ligamentous structures and stability after this length of time, with the symptoms and what had gone on in the past.

In the case of Kiger v. Terminal Railroad Association of St. Louis, Mo., 311 S. W.2d 5, relied upon by defendant, the medical witness, without neurological evidence to support it, and having examined the plaintiff three times, testified that a herniated disc had probably occurred. On cross-examination he stated that he was not prepared to say, with medical certainty, that there was such a disc. This was held to be insufficient to support a conclusion that plaintiff sustained a ruptured disc. In Bertram v. Wunning, Mo.App., 385 S.W. 2d 803, 807, held not to be substantial evidence of causal connection between a hernia injury and an accident was the doctor's answer to a request for an opinion thereon based upon reasonable medical certainty: " 'It could be. I couldn't say.' " And, " ' * * * it would be about a 90 per cent chance that it was caused by (the accident) and 10 per cent it wasn't.' " It was there said, loc. cit. 385 S.W.2d 807 [5, 6], "And as noted, the rule is that expert testimony that a condition might or could have resulted from an accident, when standing alone and without other facts, is not substantial evidence from which a jury can find cause and effect." In Zoeller v. Terminal Railroad Ass'n of St. Louis, Mo.App., 407 S.W.2d 73, there was no evidence that plaintiff would suffer pain in the future or that there was a permanent injury, and counsel argued the latter matter to the jury over defendant's objections. It was held to be error requiring a new trial on damages only to include in the damage instruction compensation for future damages. So also in the case of

Hoffman v. Illinois Terminal Railroad Company, Mo.App., 274 S.W.2d 591, where the doctor-witness on cross-examination repudiated previous testimony which indicated that plaintiff had suffered a permanent injury.

None of the medical testimony in the foregoing cases is comparable to that here given by Dr. Overesch. It is noted that Dr. Overesch was plaintiff's treating physician from the very day of the collision, and continued as such to the date of trial. During all of this time he examined plaintiff and treated him on many occasions (making detailed clinical findings, not in full set forth herein). At various times during this treatment he stated that he felt (nonetheless a medical opinion) that plaintiff had a disc or intervertebral disc injury with nerve root compression in his low back. His medical opinion given at trial was that plaintiff, in *reasonable medical probability* for attempted relief, would require surgery for decompression of the nerve roots if the pain persisted. His opinion was further that plaintiff's injuries were permanent, with *reasonable medical certainty*, if plaintiff did not accept surgery. As to Dr. Overesch's terms that plaintiff would "most likely" require surgery for nerve root decompression (within reasonable medical probability), and his expectation that a fusion of the spine would "more likely" be needed, and his doubt that after the length of time plaintiff had normal stability of his back, the case of Garard v. Manufacturers' Coal & Coke Co., 207 Mo. 242, 105 S.W. 767, 771, is illuminating. The medical witness was asked: "Q. State what results are likely to follow." Dictionary definitions of "likely" were given as: "Worthy of belief"; "Reasonably expected"; "As may be reasonably supposed." It was said, "As said by Judge Bland, one of the definitions of the word 'likely' is 'reasonably expected,' and there is but a slight shade of difference between 'reasonably expected' and 'reasonably certain.' Should we substitute the words 'reasonably expected' for the word 'likely' in this question, we think it

would meet the requirements of the law, which says that future damages and results must be such as are reasonably certain to follow."

In the case of Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S.W.2d 894, 902 [10], it was held that the doctor's testimony that there was a reasonable probability that a discernible bone piece might come through the skin at any time authorized the jury to be instructed as to future damages. That case is comparable to the testimony of Dr. Overesch, which, viewed as a whole and in context, supports the giving of plaintiff's instruction upon future damages. There is competent, substantial evidence that plaintiff would in the future be required to have surgery for his disc injury, and that a fusion operation would more likely be required. This appears with reasonable medical certainty as required, and does not amount to conjecture and speculation or a mere possibility of surgery. Under the case of Gelhot v. City of Excelsior Springs, Missouri, Mo. App., 277 S.W.2d 650, it is of no consequence that plaintiff did not prove the cost of fusion or stabilization surgery. (Presented in defendant's motion for new trial, but not on this appeal.)

■ Since there was substantial evidence to support the instruction as to future damages, it would have been error to have given the withdrawal instructions, Nos. 12 and 13. For the same reason there exists no basis for the court to sustain defendant's motion for new trial on such grounds. The jury could properly consider the fact that plaintiff would, in reasonable medical probability or certainty, be required to undergo future surgery to alleviate his conditions resulting from the collision, and this brings into focus the third ground for the order of a new trial.

■ Defendant says that the third ground for new trial constitutes a ruling "that the verdict was against the weight of the evidence." Note that ground three recites that "The verdict of the jury is excessive *in that* it permits the inclusion of damages on the issue of surgery * *." It does not say merely that the verdict was excessive, which would, under Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S.W.2d 426, be tantamount to granting a new trial on the weight of the evidence (and in which case a conditional remittitur would be in order, Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, 576, 161 A.L.R. 383, unless there exists bias and prejudice on the part of the jury influencing the verdict, Nussbaum v. Kansas City Stock Yards Co. of Maine, Mo., 359 S.W.2d 335). It does not say at all that the verdict is against the weight of the evidence—a discretionary ground for new trial not to be interfered with by this court. Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558; Dintelman v. McHalffey, Mo., 435 S.W.2d 633. At best, this third ground expresses the trial court's belief that the evidence was insufficient to support an award for future damages. This order, then, was conditional or dependent upon there being a lack of such evidence, and since it is above ruled that competent and substantial evidence is in the case that plaintiff would in reasonable probability be required to undergo future surgery to alleviate his condition, the stated basis for ground three is in error. No other ground to review the amount of the verdict is presented upon this appeal.

The judgment is reversed and the case is remanded with directions to reinstate the verdict for plaintiff.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

DONNELLY, P. J., and FINCH and HOLMAN, JJ., concur.

MORGAN, J., not sitting.